FILED
2017 Apr-10  AM 10:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit "A"

# Part I

ELECTRONICALLY FILED
4/2017 4:00 PM
01-CV-2017-900817.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Cas<br>01<br><br>Date of Filing:<br>03/01/2017   Judge Code: |
| --- | --- | --- |

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

### ASHFORD TOWNHOMES BIRMINGHAM LLC ET AL v. BLUE ROCK PARTNERS, LLC

**First Plaintiff:** ☑ Business  ☐ Individual        **First Defendant:** ☑ Business  ☐ Individual
 ☐ Government  ☐ Other                        ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other:_____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Properly

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS  (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/ Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☑ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**   F ☑ INITIAL FILING        A ☐ APPEAL FROM DISTRICT COURT        O ☐ OTHER

           R ☐ REMANDED        T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**  ☑ YES  ☐ NO      **Note:** Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**    ☑ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
STE010                3/1/2017 4:00:54 PM                /s/ CHARLES D STEWART
                       Date                    Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**        ☐ YES ☑ NO ☐ UNDECIDED

ELECTRONICALLY FILED
4/7/2017 4:00 PM
01-CV-2017-900817.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

### IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
### BIRMINGHAM DIVISION

| | | |
|---|---|---|
| ASHFORD TOWNHOMES | ) | |
| BIRMINGHAM LLC, AUTUMN | ) | |
| BIRMINGHAM LLC, BOULDER | ) | |
| BIRMINGHAM LLC, DEERFIELD | ) | |
| BIRMINGHAM LLC, MAGNOLIA | ) | |
| BIRMINGHAM, LLC, OAK | ) | |
| BIRMINGHAM LLC, AND STONE | ) | |
| BIRMINGHAM LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| BLUE ROCK PARTNERS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

### Parties

1.      Plaintiffs are seven (7) Delaware limited-liability companies that share GK Birmingham, LLC, also a Delaware limited-liability company, as their sole member.  Each Plaintiff individually owns a multi-family apartment complex and accompanying real property and improvements located in Jefferson County, Alabama, as follows:

      a.      Plaintiff Ashford Townhomes Birmingham LLC ("**Ashford**") owns The Park at Wellington, located at 861 Tyler Circle, Hoover, Alabama 35226.  That property, comprised of 168 rental units along with certain recreational facilities and other appurtenances, is referred to herein as the "**Wellington**" or "**Wellington**."

      b.      Plaintiff Autumn Birmingham LLC ("**Autumn**") owns The Park at Wakefield, located at 860 Tyler Circle, Hoover, Alabama 35226.  That property, comprised of 240 rental units along with certain recreational facilities and other appurtenances, is referred to herein as the "**Wakefield Property"** or "**Wakefield**."

1

c.      Plaintiff Boulder Birmingham LLC ("**Boulder**") owns The Park at Buckingham Apartments, located at 114 Aspen Circle, Homewood, Alabama  35209.  That property, comprised of 583 rental units along with certain recreational facilities and other appurtenances, is referred to herein as the "**Buckingham Property**" or "**Buckingham**."

d.      Plaintiff Deerfield Birmingham LLC ("**Deerfield**") owns The Park at Deerfield Apartments, located at 3627 Cedarbrook Drive, Hoover, Alabama  35216.  That property, comprised of 320 rental units along with certain recreational facilities and other appurtenances, is referred to herein as the "**Deerfield Property**" or "**Deerfield**."

e.      Plaintiff Magnolia Birmingham LLC ("**Magnolia**") owns The Park at Hoover Apartments, located at 2135 Centennial Drive, Hoover, Alabama  35216.  That property, comprised of 1,080 rental units along with certain recreational facilities and other appurtenances, is referred to herein as the "**Hoover Property**"  or "**Hoover**."

f.      Plaintiff Oak Birmingham LLC ("**Oak**") owns The Park at Carlyle Apartments, located at 200 Robert Jemison Drive, Birmingham, Alabama  35209.  That property, comprised of 649 rental units along with certain recreational facilities and other appurtenances, is referred to herein as the "**Carlyle Property**" or "**Carlyle**."

g.      Plaintiff Stone Birmingham LLC ("**Stone**") owns The Park at Callington Apartments, located at 700 Aspen Drive, Birmingham, Alabama  35209.  That property, comprised of 604 rental units along with certain recreational facilities and other appurtenances, is referred to herein as the "**Callington Property**" or "**Callington**."

2.      The seven above-reference properties are collectively referred to herein as the "**Birmingham Properties**."  The seven Plaintiffs are collectively referred to herein as the "**Plaintiffs**."  The Plaintiffs are joined in this action pursuant to Ala. R. Civ. P. 20(a).

2

3.      Defendant Blue Rock Partners, LLC ("**Blue Rock**") is a Florida limited-liability company.  Blue Rock is controlled by Reuven Oded, Blue Rock's manager.  At all times relevant to this Complaint, Blue Rock was doing business in Jefferson County, Alabama.

### Jurisdiction and Venue

4.      This Court has subject matter jurisdiction over this civil action under Ala. Code § 12-11-30, in that the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs.

5.      Venue is proper in this Court under Ala. Code § 6-3-6, in that Blue Rock was, at all times relevant to this Complaint, doing business in Jefferson County, Alabama.  Moreover, in Section 20 of the governing management agreements between Plaintiffs and Blue Rock (the "**Management Agreements**"), the parties agreed that "[v]enue for any action hereunder shall be in the appropriate court of Jefferson County, Alabama."

### Nature of the Case

6.      Plaintiffs bring this lawsuit to recover over $10 million in damages caused by Blue Rock's long-standing, wide-ranging, and flagrant mismanagement of the Birmingham Properties.   On its website, Blue Rock markets itself as "excellence defined," claiming that "[w]e take pride in our obsession to detail, in our determination to try harder, to do it better and to deliver results."[1]   Blue Rock boasts that its "integrity and reputation is the bedrock of [its] business …"[2]  Plaintiffs' experience with Blue Rock proves otherwise.

7.      As detailed below, Plaintiffs relied on Blue Rock's professed expertise and entrusted Blue Rock with Plaintiffs' business reputation in the community.  Yet the magnitude

---

[1] *See* http://www.bluerockpartnersllc.com/

[2] *Id.*

and ineptitude of Blue Rock's conduct is truly outrageous—Plaintiffs have already spent over $200,000 uncovering what is likely only part of the tremendous financial and reputational damage caused by Blue Rock.  The damage includes lost rents that Blue Rock never bothered to collect, rent pocketed by property management staff hired and supervised by Blue Rock, self dealing payments by Blue Rock to its affiliates, payment for improvements and repairs that were never performed, wrongful expense reimbursements by Blue Rock to its management and staff, and tarnish to Plaintiffs' business reputation in the community.  But Blue Rock's misconduct did not only injure Plaintiffs, it injured innocent families living in the Birmingham Properties, who were repeatedly subjected to criminal fraud and abuse and substandard living conditions caused by Blue Rock personnel and other tenants who Blue Rock failed to properly screen and supervise.

8.      Over the past several months, Plaintiffs repeatedly confronted Blue Rock, detailed the wrongful conduct and damage, and demanded that Blue Rock fix these issues.  In response, Blue Rock acknowledged substantial wrongdoing by its personnel, but refuses to remedy the damage it has caused.  Instead, Blue Rock's principal, Reuven Oded, is concerned only with cashing out on his interest in Plaintiffs' affiliates in Florida (where Blue Rock likewise caused damage) without regard for the damage caused in Jefferson County.  As a result, Plaintiffs must spend more time and expense to hold Blue Rock accountable.

9.      Accordingly, Plaintiffs sue Blue Rock for breach of contract, negligence, gross negligence/wantonness, fraud, conversion, suppression, unjust enrichment, and for indemnification of Plaintiffs' reasonable and necessary attorneys' fees incurred in this action.

## Facts

### A.      The Management Agreements

10.      Blue Rock managed the Birmingham Properties pursuant to seven (7) separate Management Agreements, the operational terms of which are substantively identical.[3]  By way of example, a copy of the Management Agreement for the Wellington Property is attached hereto as **Exhibit 1**.  Under the agreements, Plaintiffs entrusted Blue Rock with virtually every aspect of the day-to-day operation of the Birmingham Properties.   For example, Blue Rock was "responsible for the management, maintenance, repair, promotion, ownership and operation" of the Birmingham Properties as well as handling all property-related purchases, leases, and utilities.  *See* Agreements § 4.  Blue Rock hired a regional manager to oversee the Birmingham Properties, as well as separate local property management and property-level employees for each Property.  Blue Rock was responsible for screening and supervising these individuals.  *Id*. § 3(ii), 4(l).

11.      Blue Rock was entrusted to negotiate, execute, administer, and enforce all service contracts.  *Id.* § 4(c) & (d).  Blue Rock agreed to collect and apply all rents and other property revenue.  *Id.* § 4(f).  Indeed, Blue Rock was entrusted to make Plaintiffs' respective monthly mortgage payments out of funds from the respective property.  *Id*. § 7.  Blue Rock was paid 3% of monthly gross receipts from each property.  *Id.* § 5.

12.      Not surprisingly, Plaintiffs coupled expansive trust in Blue Rock with expansive and specific obligations on Blue Rock.  For example, Blue Rock was required to submit an

---

[3]  The Management Agreements have differing effective dates, from October 31, 2013 (Oak, Stone, Autumn, Ashford) at the earliest to August 27, 2015 (Deerfield) at the latest.

annual budget to each Plaintiff for each property no later than 90 days prior to the end of each calendar year.  *See* Agreements § 4(e).  Absent written approval by the respective Plaintiff-owner, no individual property expenditure by Blue Rock could exceed 10% of the budgeted amount; nor may aggregate annual expenditures exceed 15% of the budgeted amount.  *Id.* § 4(b).

13.     Further, Blue Rock agreed to provide weekly leasing reports, bi-weekly leasing status calls and normal day-to-day accounting services and to maintain true and accurate records for each property to facilitate annual reports or audits by independent certified accountants.  *Id.* § 4(e).  Blue Rock's promise to provide accurate financial records to Plaintiffs was especially important since Blue Rock paid itself 3% of monthly gross receipts, as documented by Blue Rock.  *Id.* § 5.  So trust and confidence in Blue Rock's integrity was absolutely essential in performing its property management obligations, both under the Management Agreement and pursuant to applicable law.

14.     With respect to contractors, Blue Rock was required to supervise and inspect the performance of all contracts and leases, even for routine maintenance.  *Id.* § 4(d).  Indeed, Blue Rock promised that "no payments are [to be] made to a service provider unless the work performed for such payment was performed in a good and workmanlike manner, in accordance with the applicable Service Contract."  *Id.* § 4(d)(iv).  To prevent self-dealing and fraud, Blue Rock was expressly prohibited from contracting with any of its affiliates without prior written approval from the respective Plaintiff-owner.  *Id.* § 4(d).

**B.     Plaintiffs Uncover Blue Rock's Fraud**

15.     Beginning in 2014, Plaintiffs discovered substantial irregularities when reviewing financials for the Birmingham Properties submitted by Blue Rock.  Plaintiffs promptly engaged a third-party professional auditor to investigate Blue Rock's management of the Birmingham

6

Properties and other properties in Florida.   By September 2015, the investigation found evidence indicating that Blue Rock engaged in fraud, gross negligence/wantonness, self-dealing, and other conduct in violation of applicable law and the Management Agreements, including:

- Failure to properly deal with and account for trust funds, including checks written by Blue Rock for insufficient funds.

- Submitting inaccurate and incomplete monthly financials, thereby overpaying itself as a percentage of falsely reported monthly receipts.

- Substantial corporate level expenses improperly reimbursed, including regional bonuses, regional travel, management travel, third party accounting expenses, and regional manager salaries.

  - A breakdown of disallowed expenses currently known to Plaintiffs (there are most likely more) is as follows:

| | |
|---|---|
| Related Party Vendors | $166,204 |
| Accounting Services / Related | $4,134 |
| Training | $27,762 |
| Payroll / Settlement / Bonus | $37,728 |
| Rent Reimbursements | $18,799 |
| Executive Travel / Expense | $106,675 |
| Other Travel | $1,034 |
| Free Rent | $8,839 |

  **Total Disallowed Expense        $371,175**

  - A breakdown of known impermissible payments to vendors affiliated with Blue Rock or property management is as follows:

| | |
|---|---|
| A. Garner Properties, LLC | $9,435 |
| → owned by a regional manager's wife | |
| Kontos Properties & Investments, Inc. | $98,523 |
| → owned by Blue Rock's Gillian Kontos | |
| Venture Realty & Construction | $58,245 |
| → employee was property manager at Carlyle/Callington Properties | |

  **Total Payments to Related Vendors        $166,204**

- Expenses exceeding budget by over 10% without prior approval.

- Changes made to budgets without prior approval.

7

- o The plaintiff entrusted Blue Rock to complete a $12.4 million capital upgrade project at the Birmingham Properties.  A substantial amount of this budget was allocated towards upgrading unit interiors.  After past due invoices were settled with vendors after Blue Rock's resignation, $12 million of this budget had been spent.  Blue Rock erroneously reported on multiple occasions that the rehab project was nearly complete.  However, Plaintiffs later determined that less than half of the work was actually completed.  Not only did Blue Rock go 10% ($2.8 million in non-approved spending) over budget without ownership approval (as required under the management agreement) but a significant portion of the work was never completed and the funds remain missing.

- Failure to pay required vendor invoices, resulting in lawsuits, liens, and services cancelled.  For example, Blue Rock's subscription to Apartments.com, a critical marketing website, was cancelled for an extended period due to non-payment.

  - o A breakdown of known late payments to vendors is as follows:

| | |
|---|---|
| Deerfield | $56,106 |
| Buckingham | $71,554 |
| Carlyle | $190,701 |
| Callington | $101,152 |
| Hoover | $139,853 |
| Wakefield | $41,667 |
| Wellington | $16,532 |

  **Total Late Vendor Payments**          **$617,565**

  - o Some of the lawsuits filed by unpaid Blue Rock vendors, which so far have required Plaintiffs to expend time and resources, including legal fees, are:

    *SST Properties, Inc. v. Blue Rock Partners, LLC, et al*., Case No. CV-2015-902028.00 in the Circuit Court of Jefferson County, Alabama (vendor / plaintiff seeking over $50,000 in unpaid invoices)

    *Surface Tech, LLC v. Blue Rock Partners, LLC, et al*., Case No.  CV-2015-00420 in the Circuit Court of Jefferson County, Alabama (vendor / plaintiff seeking over $70,000 in unpaid invoices)

    *Anthony Carey v. Blue Rock Partners, LLC*, Case No. 01-CV-2016-9021622.00, in the Circuit Court of Jefferson County, Alabama (vendor / plaintiff seeking over $30,000 in unpaid invoices)

8

- Failure to properly screen tenants for credit and/or criminal history, resulting in, on information and belief, multiple incidents against multiple families and guests at the Birmingham Properties (both tenants and guests).

- Failure to screen tenants for financial history—including lack of former landlord references—resulting in excessive tenant payment defaults and walkouts.

  o A breakdown of the tremendous cost increase from delinquencies, write-offs, and legal and eviction expenses caused by Blue Rock's failure to properly screen tenants is as follows:

**Delinquency / Write-offs**

| Property | 12 Months Through August 2015 | 12 Months Through November 2016 | Increase |
|----------|-------------------------------|---------------------------------|----------|
| Callington | $200,060 | $232,568 | 16% |
| Carlyle | $102,293 | $242,257 | 137% |
| Buckingham | $202,128 | $210,232 | 4% |
| Wakefield | $84,089 | $157,061 | 87% |
| Wellington | $43,464 | $7,085 | 54% |
| **Total** | **$632,034** | **$909,202** | **44%** |

**Legal / Eviction Expenses**

| Property | 12 Months Through August 2015 | 12 Months Through November 2016 | Increase |
|----------|-------------------------------|---------------------------------|----------|
| Callington | $32,623 | $88,967 | 173% |
| Carlyle | $21,683 | $100,479 | 363% |
| Buckingham | $35,376 | $64,182 | 81% |
| Wakefield | $8,339 | $32,422 | 277% |
| Wellington | $5,305 | $12,104 | 128% |
| **Total** | **$103,326** | **$297,154** | **188%** |

- Failure to screen employees for criminal history, resulting in (a) multiple incidents against multiple families and guests at the Properties (both tenants and guests); and (b) employee theft and fraudulent activity.

  o For example, multiple employees were accused of stealing HVAC materials and equipment from apartment units and several employees were fired for this. In addition, several vendors reported to Plaintiffs that the vendors were asked by property management to increase vendor invoices and secretly pay kick-backs to property employees.

- o Investigation uncovered thousands of dollars in money orders from tenant deposits in property managers' desks following Blue Rock's termination.

- Failure to address major tenant complaints regarding broken common facilities, including complete shut-down of all five (5) pools at the Birmingham Properties.

- Failure to give Plaintiffs prior notice of changes to management personnel.

16.     Plaintiffs detailed many of these violations to Blue Rock in a letter dated September 22, 2015, a copy of which is attached to this Complaint as **Exhibit 2**.  Plaintiffs closed the correspondence demanding that Blue Rock correct this egregious misconduct.[4]

17.     In response, Blue Rock offered to resign as property manager for all of the Birmingham Properties.  A copy of that letter, dated September 30, 2015, is attached to this Complaint as **Exhibit 3**.  Unwilling to fully accept responsibility for its flagrant mismanagement, however, Blue Rock attempted to condition its resignation "upon a mutual release to be executed between the parties."  *See* September 30 Blue Rock Letter (Ex. 1).  At that time, Plaintiffs' investigation of Blue Rock's misconduct was not final, but Plaintiffs already knew that Blue Rock had caused several millions of dollars in damages in Birmingham alone.  Thus, Plaintiffs refused to execute any release absolving Blue Rock.

**B.     Plaintiffs Terminate Blue Rock**

18.     A month passed, but Blue Rock made no effort to fix the damage it caused.  Consequently, on October 29, 2015, Plaintiffs terminated Blue Rock as manager of the Birmingham Properties due to Blue Rock's fraud, gross negligence/wantonness, and failure to failure to cure its multiple defaults under the Management Agreements.  *See* October 29, 2015 Termination Letter, attached as **Exhibit 4**.  That same day, Plaintiffs separately notified Blue

---

[4] Because the investigation also uncovered Blue Rock mismanagement related to the Florida properties, which are owned by Plaintiffs' affiliates, the September 22 correspondence addressed both Birmingham and Florida issues.

Rock that Plaintiffs had discovered even more fraud, theft, and mismanagement by Blue Rock at the Birmingham Properties. *See* October 29, 2015 Investigation Update Letter, attached as **Exhibit 5**. Plaintiffs were entitled to immediately terminate the Management Agreements based on, among other things, Blue Rock's (a) failure to properly deal with and account for trust funds; or (b) fraud, misappropriation of funds, gross negligence/wantonness, or willful misconduct. *See* Managements Agreements § 2(iv) & (vi). In any event, Blue Rock made zero effort to cure its defaults between the time Blue Rock first received written notice (September 22) and date on which Blue Rock was terminated by Plaintiffs (October 29).

19.     On November 12, 2015, Blue Rock responded via letter to Plaintiffs' common sole member (GK Birmingham, LLC). A copy of that letter is attached hereto as **Exhibit 6**. The response is a litany of denials and excuses. Notably, Blue Rock claims to have "filed appropriate claims with our insurance carriers for any of the alleged matters that may be covered." If any claims were paid, Blue Rock must have pocketed the cash, because Plaintiffs have received nothing.

20.     On June 27, 2016, Plaintiff sent Blue Rock a detailed memorandum outlining the substantial damaged caused by Blue Rock's fraud, gross negligence/wantonness, self-dealing, and other mismanagement at the Birmingham Properties. A copy of that memorandum is attached hereto as **Exhibit 7**. The memorandum identifies five categories of damages caused by Blue Rock in Birmingham (not including consequential and other damages) as follows:

a.     Missing Rents, Security Deposits, Other Fees:     $386,318

b.     Disallowed Blue Rock Management Reimbursement     $371,175

c.     Unapproved Capital Expenditures 10% Over Budget:     $2,782,714

d.     Management Fee for Over-Budget Expenses (8%):     $222,617

| e. | Investigation and Legal Costs: | $207,471 |
|---|---|---|

| **TOTAL:** | | **$3,970,295** |
|---|---|---|

### Count One – Breach of Contract

21.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

22.     Blue Rock's misconduct, summarized above, breached numerous provisions of

the Management Agreements.  Some of those include:

**Section 3(ii):**  Blue Rock represents and warrants that "all of MANAGER'S[5] employees that are involved in the day-to-day management of the PROPERTY or will be on the PROPERTY ("**SITE EMPLOYEES**") have successfully passed a background check (e.g., no criminal convictions) and an illegal drug screen";

**Section 4**:  Blue Rock "shall be responsible for the management, maintenance, repair, promotion, ownership and operation of the PROPERTY" and "shall cause repairs to be made and shall perform such other functions and services as are required to maintain the PROPERTY in good condition consistent with that of other properties located in Alabama that are of similar size, quality and nature as the PROPERTY and shall operate the PROPERTY in accordance with all applicable federal, state and municipal laws, ordinances, regulations and orders relative to the leasing of the PROPERTY";

**Section 4(a)**:     "Notwithstanding anything to this Agreement in the contrary, the following expenses or costs incurred by or on behalf of MANAGER in connection with the management and leasing of the PROPERTY shall be at the sole cost and expense of MANAGER and shall not be reimbursed by OWNER:

**Section (a)(i):** "Cost of gross salary and wages, payroll taxes, insurance, worker's compensation, and other benefits of MANAGER's office personnel not identified in the applicable Annual Budget; provided, however, notwithstanding anything to the contrary herein or in any Annual Budget, no such salary, wages or other benefits shall be at any time paid MANAGER for any employee of MANAGER not on site at the PROPERTY, unless said employee is the regional manager of MANAGER or is otherwise previously approved by OWNER[6] in writing (in OWNER's sole discretion)";

**Section 4(a)(ii)**:  "General accounting and reporting services which are considered to be within the reasonable scope of MANAGER'S responsibility to OWNER";

---

[5] "MANAGER" under the Management Agreements means Blue Rock, and includes its trustees, agents, directors, officers, servants and employees.  *See* Agreements § 11.

[6] "OWNER" under the Management Agreements means each respective owner of the respective Birmingham Property.

**Section 4(a)(vi)**:  "Unless the cost is set forth as a separate line item in the applicable Annual Budget, cost of advances made to employees and cost of travel by managers, employees or associates to and from the PROPERTY";

**Section 4(a)(vii)**:  "Cost attributable to losses arising from gross negligence, fraud, willful misconduct or breach of this Agreement on the part of MANAGER, MANAGER'S associates or MANAGER'S employees";

**Section 4(a)(ix)**:  "Costs incurred pursuant to any contract with any affiliate of MANAGER, unless such contract has been previously approved by OWNER in accordance with Section 4(d)";

**Section 4(b)**:  "For any contract, maintenance, service, repair, replacement, refurbishing project or item or other expense, the line item expense incurred shall not exceed ten percent (10%) of the budgeted amount therefor in the applicable Annual Budget, and aggregate annual expenses shall not exceed, in the aggregate, fifteen percent (15%) of the total budgeted annual expenditures set forth in the Annual Budget";

**Section 4(c)**:  Blue Rock shall, "in the name of and on behalf of OWNER, negotiate, execute, administer and enforce service and maintenance contracts (the "SERVICE CONTRACTS") required in the ordinary course of maintaining the PROPERTY in accordance with this Agreement and the Requirements";

**Section 4(d)**:  Blue Rock will "[s]upervise and inspect the performance of all Service Contracts and rental leases entered into by MANAGER, and shall supervise and inspect all servicing or routine maintenance work performed at the PROPERTY.  MANAGER may not contract with any affiliate of MANAGER for the performance of services for the PROPERTY without full disclosure to, and the prior written approval of, OWNER";

**Section 4(d)(iv)**:  Blue Rock shall "ensure that no payments are made to a service provider unless the work performed for such payment was performed in a good and workmanlike manner";

**Section 4(f)**:  Blue Rock must "[b]ill, collect and receive in the name of OWNER all rents, assessments and charges due or to become due from tenants and occupants of rental units located on the PROPERTY and deposit such rents in the Operating Account …"

**Section 4(g)**:  Blue Rock was prohibited from commingling any funds in the Operating Account with any other funds;

**Section 4(l)**:  Blue Rock must "[p]roperly supervise, or cause Employer[7] to properly supervise, the work of its managers, assistants and all other employees as well as all

---

[7] "Employer" under the Management Agreements means any Blue Rock affiliate who hires employees for the Birmingham Properties at Blue Rock's direction.  *See* Agreements § 4(j).

services providers engaged by MANAGER on behalf of OWNER.  MANAGER or Employer, as applicable, covenants that (1) all of its employees that are involved in the day-to-day management of the PROPERTY or will be on the PROPERTY shall have successfully passed on a background check (e.g. no criminal convictions) and an illegal drug screen, and (2) it has and will maintain policies in place, and provide training for such employees, with respect to all applicable laws in connection with the performance of its obligations under this Agreement …"

23.    Blue Rock's multiple breaches of the Management Agreements have proximately caused damages to Plaintiffs in excess of $10 million, with damages, costs, and expenses continuing to accrue on a daily basis.

## Count Two – Negligence, Gross Negligence, and Wantonness

24.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

25.    Blue Rock had a duty to exercise reasonable care in performing services for Plaintiffs, including a common law duty not to cause tremendous damage to the Birmingham Properties, which were entrusted to Blue Rock's safeguard.  Blue Rock breached its duty to Plaintiffs by its long-standing and deliberate misconduct, as outlined above.  Thus, Blue Rock was negligent, and its negligence proximately caused damage to Plaintiffs in excess of $10 million, with damages, costs, and expenses continuing to accrue on a daily basis.

26.    Moreover, because Blue Rock knew that its conduct constituted a brazen disregard of the extreme degree of risk that Plaintiffs would suffer substantial damage, Blue Rock's conduct constitutes gross negligence and wantonness, for which Blue Rock is liable for both actual and exemplary damages, among other amounts.

## Count Three – Fraud

27.    Plaintiffs incorporate by reference the preceding allegations of this Complaint.

28.    As explained above, Blue Rock was required to submit an annual budget to the Plaintiffs.  On several occasions, Blue Rock's surreptitiously altered budgets after submission

without Plaintiffs' approval.  On information and belief, Blue Rock did so to cover up its and/or its affiliates' misappropriating and/or misdirecting funds from the Birmingham Properties.

29.     The actions of Blue Rock amount to fraud under Alabama law.  Blue Rock's fudging the numbers constitute material misrepresentations from Blue Rock on which Blue Rock intended that Plaintiffs' would rely, and on which Plaintiffs indeed did rely to their detriment.

30.     Blue Rock is also liable for the fraud of regional managers, local property managers and employees at each of the Birmingham Properties, who Blue Rock agreed to screen and supervise, and which were acting at all relevant times as agents of Blue Rock.  The multiple instances of fraud by the local property management and employees—including pocketing rents and kickbacks, subjects Blue Rock to liability for fraud.

31.     Blue Rock's fraudulent acts have proximately caused damages to Plaintiffs in excess of $10 million, with damages, costs, and expenses continuing to accrue on a daily basis. As a consequence of Blue Rock's fraud, it is liable to Plaintiffs for exemplary damages.

### Count Four – Conversion

32.      Plaintiffs incorporate by reference the preceding allegations of this Complaint.

33.     Under the Management Agreements, Blue Rock agreed to hold revenue from each of the Birmingham Properties in trust for the benefit of each respective Plaintiff.  As detailed above, Blue Rock was required to maintain revenue from each property separate and distinct from all other revenue.  By siphoning funds to wrongfully pay affiliates and to wrongfully reimburse Blue Rock managers—thereby enriching itself—Blue Rock exercised wrongful dominion and control over property revenues, and thereby converted those funds.   On various occasions, without ownership approval, Blue Rock also used supplies designated for the Birmingham Properties for the benefit of other properties not owned by Plaintiff.

34.     Further, Blue Rock is also liable for the conversion of rents and revenues from the Birmingham Properties by local property management and employees, who Blue Rock agreed to screen and supervise, and which were acting at all relevant times as agents of Blue Rock.  The multiple instances of conversion by the local property management and employees—including pocketing rents and kickbacks, subjects Blue Rock to liability for conversion.

35.     Blue Rock's conversion has proximately caused damages to Plaintiffs in an amount within the jurisdictional limits of this court, with damages, costs, and expenses continuing to accrue on a daily basis.  As a consequence of Blue Rock's conversion, it is liable to Plaintiffs for exemplary damages.

### Count Five – Suppression

36.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

37.     Under the Management Agreements, Blue Rock had a duty to timely deliver to Plaintiffs financials for the Birmingham Properties.  Blue Rock consistently breached that duty, suppressing material information that reflected rampant and long-standing mismanagement of the Birmingham Properties, as detailed above.  Indeed, Blue Rock provided late financials on nearly every occasion for the Birmingham Properties.

38.     Blue Rock's suppression of that material information about the finances and related operations of the Birmingham Properties has proximately caused damages to Plaintiffs in an amount within the jurisdictional limits of this court, with damages, costs, and expenses continuing to accrue on a daily basis.

### Count Six – Unjust Enrichment / Money Had and Received

39.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

40.     As a result of Blue Rock's breaches of contracts, negligence, gross negligence, wantonness, fraud, conversion and suppression as set out above, Blue Rock (or those within Blue Rock's control) has been unjustly enriched by the unlawful receipt, conversion and retention of Plaintiffs' funds and Blue Rock holds money that in equity and good conscience belongs to Plaintiffs.  As a result of said knowing and intentional wrongdoing by Blue Rock, Plaintiffs have suffered and continue to suffer damages as described above and the expenditures of time, costs, expenses and attorneys' fees and consequential damages incurred to file this suit to obtain the monies and property which rightfully belong to Plaintiffs.

### Count Seven – Indemnification / Attorneys' Fees

41.     Plaintiffs incorporate by reference the preceding allegations of this Complaint.

42.     Section 26 of the Management Agreements provides that, in the event any party files suit in connection with a Management Agreement, the "party which prevails in such action shall be entitled to recover, in addition to all other remedies or damages, reasonable attorneys' fees (including appellate proceedings) and court costs incurred in such suit."

43.     As a result of Blue Rock's breaches and other wrongful conduct described above, Plaintiffs have incurred costs, expenses, and attorneys' fees associated with this action.

### Consequential Damages

44.     Blue Rock's long-standing misconduct and mismanagement has caused substantial damage to Plaintiffs' business reputation in the community and elsewhere. As a result, Plaintiffs have suffered lost past and future rents and revenues, including earnings from future commercial real estate transactions and other opportunities.  Plaintiffs believe such damages exceed $10 million and will prove such damage at the time of trial.

17

**Prayer for Relief**

WHEREFORE, Plaintiffs demand judgment against Blue Rock for (a) Plaintiffs' actual damages in an amount exceeding $10 million, which continues to accrue on a daily basis; (b) other compensatory and consequential damages; (c) punitive damages due to Blue Rock's gross negligence/wantonness, fraud, and conversion; (d) indemnification and award of reasonable and necessary attorneys' fees incurred by Plaintiffs in this lawsuit; (e) pre- and post-judgment interest; and (f) any additional relief to which Plaintiffs are entitled.

Dated this 1st day of March, 2017.

Respectfully submitted,

 s/ Charles D. Stewart
Charles D. Stewart (STE010)
Aaron B. Thomas (THO161)
Attorneys for Plaintiffs

OF COUNSEL:
SPAIN & GILLON, LLC
2117 Second Avenue North
Birmingham, Alabama 35203
PH:  (205) 328-4100
FX:  (205) 324-8866
Email:  cds@spain-gillon.com
            abt@spain-gillon.com

**JURY DEMAND**

Plaintiffs demand trial by struck jury on all claims.

s/ Charles D. Stewart
Of Counsel

## NOTE TO CLERK

Plaintiff requests Service of Process upon Defendant by Certified Mail Return Receipt Requested addressed as follows:

Blue Rock Partners, LLC
c/o CSC Lawyers Incorporating Svc, Inc.
150 South Perry Street
Montgomery, AL  36104

ELECTRONICALLY FILED
3/7/2017 4:00 PM
01-CV-2017-900817.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## MANAGEMENT AGREEMENT

**THIS AGREEMENT**, made and entered into this October 31, 2013 **(the "EFFECTIVE DATE")**, by and between **ASHFORD TOWNHOMES BIRMINGHAM LLC**, a Delaware limited liability company (hereinafter called "**OWNER**"), whose address is 500 Commerce Street, Suite 700, Fort Worth, Texas 76102, and **BLUE ROCK PARTNERS, LLC, a Florida limited liability company** (hereinafter called "**MANAGER**"), whose address is 9260 Bay Plaza Blvd Ste 501, Tampa, FL 33619.

## RECITALS

A.     OWNER is the owner of a multi-family property located at  861 Tyler Circle, Hoover, Alabama 35226, comprised of 168 rental units along with certain recreational facilities and other appurtenances (collectively, the "**PROPERTY**");

B.     OWNER desires to retain MANAGER for the management of the PROPERTY and MANAGER wishes to make its services available under the following terms and conditions.

NOW, THEREFORE, for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid by the parties hereto, each unto the other, receipt of which considerations is hereby acknowledged, and in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto do hereby warrant, covenant and agree as follows:

1.     **ENGAGEMENT**:  The OWNER hereby engages MANAGER and MANAGER hereby accepts such engagement and agrees to serve, on the terms and conditions hereinafter provided, as managing agent of the PROPERTY.  MANAGER shall manage the PROPERTY in accordance with the standards of management used by asset or rental managers that manage properties located in Alabama that are of similar size, quality and nature as the PROPERTY.

2.     **TERM**:  Unless sooner terminated in accordance with this Section 2, this Agreement shall remain in full force and effect for a period of one (1) year, with compensation commencing on the EFFECTIVE DATE, and shall renew for successive one-year periods thereafter unless otherwise terminated by a party by providing written notice to the other party hereto at least sixty (60) days prior to the end of the then-current term. This Agreement may be immediately cancelled by OWNER for cause (which, for purposes hereof, means that any of the following have occurred: (i) MANAGER has failed to fulfill any of its obligations under this Agreement after any applicable notice and cure periods, (ii) MANAGER has assigned this Agreement or delegated its duties hereunder without the written consent of OWNER, (iii) Reuven Oded, as Key Principal (as defined in the financing documents executed by OWNER in connection with the Property), has caused OWNER to be in default under any loan entered into by OWNER in connection with the Property; or (iv) MANAGER is in default, beyond any applicable notice and cure periods, under any of the management agreements described on Schedule I attached hereto, which are each between affiliates of OWNER and MANAGER), at any time during the original term of one (1) year or any renewals thereof of this Agreement upon written notice to

MANAGER. Notwithstanding the foregoing, unless otherwise requested by OWNER pursuant to Section 4(s)(v), this Agreement shall terminate automatically upon the sale or other disposition of all or substantially all of the PROPERTY or any event that makes the development, operation or disposition of the PROPERTY impracticable or impossible (including, without limitation, condemnation of the PROPERTY), as determined by OWNER.  This Agreement may be cancelled by MANAGER at any time subsequent to the original one (1) year term of this Agreement upon giving not less than sixty (60) days prior written notice to OWNER, in which case this Agreement shall terminate on the date set forth in such notice.  This Agreement may be cancelled by OWNER at any time upon giving not less than sixty (60) days prior written notice to MANAGER, in which case this Agreement shall terminate on the date set forth in such notice.

In addition, OWNER, or MANAGER as the case may be, may immediately terminate this Agreement by the service of a written notice to that effect on MANAGER, or OWNER as the case may be, for the following reasons:

> (i)   dissolution or termination of the corporate or partnership existence of MANAGER, or OWNER as the case may be, by operation of law, merger, consolidation or otherwise;

> (ii)  termination or suspension of  MANAGER's real estate brokerage license or MANAGER's license, if such license(s) are required as a condition to managing the PROPERTY;

> (iii) cessation on MANAGER's, or OWNER's as the case may be, part to continue to do business;

> (iv)  failure of MANAGER to properly deal with and account for trust funds;

> (v)   bankruptcy, insolvency, or assignment for the benefit of the creditors of MANAGER, or OWNER as the case may be; or

> (vi)  actions by MANAGER which constitute fraud, misappropriation of funds, gross negligence, or willful misconduct.

**3.** **REPRESENTATIONS AND WARRANTIES OF MANAGER.**  MANAGER hereby represents and warrants as of the Effective Date as follows:

> (i)   MANAGER has obtained and paid for all permits, approvals and licenses necessary to perform MANAGER's obligations under this Agreement pursuant to all applicable laws;

> (ii)  all of MANAGER's employees that are involved in the day-to-day management of the PROPERTY or will be on the PROPERTY ("SITE EMPLOYEES") have successfully passed a background check (e.g. no criminal convictions) and an illegal drug screen;

> (iii) MANAGER has policies in place, and provides training for Site Employees, with respect to all applicable laws in connection with the performance of its obligations under this Agreement, including,

without limitation, laws regarding the protection of personal data and laws regarding non-discrimination in the rental of housing; and

(iv)     MANAGER has complied, and will at all times during the term of this Agreement, will comply, with all applicable laws relating to the PROPERTY and MANAGER's activities at the PROPERTY, including, but not limited to, applicable laws relating to asset or rental managers.

4.     **MANAGER'S DUTIES**:   MANAGER shall be responsible for the management, maintenance, repair, promotion, ownership and operation of the PROPERTY, including the leasing of the PROPERTY and the performance of all duties and responsibilities placed upon the OWNER by any lease agreements or other contracts (including any loan documents governing financing of all or any portion of the PROPERTY), by any restrictions or declarations recorded in the public records of the county where the PROPERTY is located, and those which may be required by law, other than those reserved specifically to the OWNER in this Agreement, and shall cause repairs to be made and shall perform such other functions and services as are required to maintain the PROPERTY in good condition consistent with that of other properties located in Alabama that are of similar size, quality and nature as the PROPERTY and shall operate the PROPERTY in accordance with all applicable federal, state and municipal laws, ordinances, regulations and orders relative to the leasing of the PROPERTY, requirements of any insurance companies covering any of the risks against which the PROPERTY is insured and with the rules, regulations and requirements of applicable board of fire underwriters or other similar insurance body and, if applicable, any loan documents governing any financing of the PROPERTY, whether mortgage or mezzanine debt, including, without limitation any operations and maintenance plans, or any other documents executed by, or binding upon, OWNER (collectively, the "**REQUIREMENTS**").

Subject to the provisions of this Agreement, MANAGER shall formulate and propose to OWNER strategies for management, promotion, and ownership of the PROPERTY, including the leasing of the rental units at the PROPERTY.  MANAGER shall provide consultation, advice, guidance and managerial services to the OWNER, and as part of the foregoing, shall be available on a regular basis for telephone calls, in person meetings or both with OWNER to discuss the status of PROPERTY operations.  OWNER authorizes MANAGER to exercise such powers (but only such powers) with respect to the PROPERTY as may be necessary for the performance of MANAGER's express duties hereunder, but subject in all events to Section 4(u) hereof and the other limitations, terms and conditions set forth in this Agreement.

In furtherance of the foregoing, MANAGER shall:

(a)     Subject to the Annual Budget (as defined below) employ, discharge and supervise and inspect the performance of all individuals or companies necessary to the performance of the duties and responsibilities placed upon MANAGER by this Agreement, including employees as well as contractors and suppliers under written or verbal agreement.  The costs or expenses incurred by MANAGER in accordance with the terms of this Agreement in the performance of this section shall be reimbursed by the OWNER to the extent the same are set forth in the Annual Budget or otherwise expressly permitted under this Agreement.  These services shall be

3

provided as often as required and shall be in accordance with the Annual Budget unless otherwise approved by OWNER, in writing, in its sole discretion. Notwithstanding anything to this Agreement in the contrary, the following expenses or costs incurred by or on behalf of MANAGER in connection with the management and leasing of the PROPERTY shall be at the sole cost and expense of MANAGER and shall not be reimbursed by OWNER:

(i)     Cost of gross salary and wages, payroll taxes, insurance, worker's compensation, and other benefits of MANAGER's office personnel not identified in the applicable Annual Budget; provided, however, notwithstanding anything to the contrary herein or in any Annual Budget, no such salary, wages or other benefits shall be at any time paid MANAGER for any employee of MANAGER not on site at the PROPERTY, unless said employee is the regional manager of MANAGER or is otherwise previously approved by OWNER in writing (in OWNER's sole discretion);

(ii)    General accounting and reporting services which are considered to be within the reasonable scope of MANAGER's responsibility to OWNER, but specifically excluding any audits, preparation of audited financials, tax returns and any other filings, reports or documentation to be prepared by any certified public accountant for the PROPERTY or OWNER;

(iii)   Cost of forms, papers, ledgers, and other supplies and equipment used in MANAGER's office at any location off the PROPERTY;

(iv)    Unless the cost is set forth as a separate line item in the applicable Annual Budget, cost of electronic data processing equipment, computers or any pro rata charge thereon, whether located at the PROPERTY or at MANAGER's office off the PROPERTY, but specifically excluding the cost of or any charges relating to any software used in connection with the operation, management, leasing or website (including emails and webhosting charges) for the PROPERTY;

(v)     Unless the cost is set forth as a separate line item in the applicable Annual Budget, cost of electronic data processing, or any pro rata charge thereof, for data processing provided by computer service companies;

(vi)    Unless the cost is set forth as a separate line item in the applicable Annual Budget, cost of advances made to employees and cost of travel by managers, employees or associates to and from the PROPERTY;

(vii)   Cost attributable to losses arising from gross negligence, fraud, willful misconduct or breach of this Agreement on the part of MANAGER, MANAGER'S associates or MANAGER's employees;

(viii)  Cost of errors and omissions insurance in the amount of $250,000 (or in such other amount as may be reasonably requested by OWNER's lender) or fidelity bond purchased by MANAGER for its own account;

(ix)    Costs incurred pursuant to any contract with any affiliate of MANAGER, unless such contract has been previously approved by OWNER in accordance with Section 4(d); and

(x)     Any other costs for which reimbursement is prohibited or which are indicated to be costs of the MANAGER under this Agreement.

4

**(b)**     Purchase, lease, contract for or otherwise arrange for all services, utilities, supplies, equipment, vehicles, maintenance agreements, bonds or materials necessary to maintain, preserve and repair the PROPERTY in accordance with the Requirements and to fulfill the obligations imposed on MANAGER by this Agreement.  MANAGER shall make reasonable efforts to obtain the best price available in relation to the level of quality specified by the OWNER or by MANAGER in the absence of any specific instruction from the OWNER.   For any contract, maintenance, service, repair, replacement, refurbishing project or item or other expense, the line item expense incurred shall not exceed ten percent (10%) of the budgeted amount therefor in the applicable Annual Budget, and aggregate annual expenses shall not exceed, in the aggregate, fifteen percent (15%) of the total budgeted annual expenditures set forth in the Annual Budget, in each case unless specifically authorized in writing by the OWNER prior to incurring such expense.   Notwithstanding the foregoing, to the extent expenditures are required in order to perform emergency maintenance to remediate manifest danger to persons or PROPERTY, or which are immediately necessary for the preservation and safety of the PROPERTY, or for the safety of persons, or required to avoid suspension of any necessary service to the PROPERTY (collectively, "**EMERGENCY EXPENDITURES**"), such Emergency Expenditures may be made by MANAGER at the expense of OWNER irrespective of the above cost limitation, provided, that such Emergency Expenditures shall not, in the aggregate, exceed $25,000 without OWNER's approval. To the extent reasonably practicable, MANAGER shall contact OWNER prior to making any such Emergency Expenditure, and in any event, shall notify OWNER within one (1) day thereafter.  These services shall be provided as often as required.

513420 000014 8118192.1

EXHIBIT 1

**(c)**     Subject to the requirements of this Section 4(c) and the Annual Budget, in the name of and on behalf of OWNER, negotiate, execute, administer and enforce service and maintenance contracts (the "**SERVICE CONTRACTS**") required in the ordinary course of maintaining the PROPERTY in accordance with this Agreement and the Requirements.   Unless otherwise approved by OWNER in writing, each Service Contract shall be for a term of twelve (12) months or less, shall be terminable by OWNER without cause on no more than thirty (30) days' notice and upon the sale or other disposition of the PROPERTY, and the nature and cost of the services contracted for shall be included in the then-current Annual Budget; provided that the foregoing restriction shall not apply and no approval from OWNER shall be required for (i) any laundry lease or laundry service contract, or (ii) any cable, telecommunications or internet service contract.   MANAGER shall not execute or otherwise enter into or bind OWNER, or cause to be executed or otherwise entered into or cause OWNER to be bound, with respect to any Service Contract for monthly or other regular services without obtaining three (3) competitive written bids from service providers for such work; provided, however, MANAGER shall not be required to obtain such three (3) bids for any service provided at market rates.   MANAGER shall use commercially reasonable efforts to cause all Service Contracts to contain an indemnity clause indemnifying OWNER and its members (and their respective legal and beneficial owners, shareholders, principals, partners, members, officers, directors, trustees, fiduciaries, agents, representatives, employees, subsidiaries, and affiliates) from and against all claims, actions, suits, proceedings, losses, damages, liabilities, judgments, costs and expenses of whatever nature (including without limitation, reasonable attorneys' fees and disbursements) arising out of, resulting from or in connection with the acts or omissions of the service provider and its directors, officers, employees, contractors, subcontractors and representatives, which constitute negligence, fraud, breach of the Service Contract, breach of fiduciary duty, reckless or criminal misconduct or any actions of the service provider beyond the scope of authority conferred upon the service provider pursuant to the terms of its Service Contract.

**(d)**     Supervise and inspect the performance of all Service Contracts and rental leases entered into by MANAGER, and shall supervise and inspect all servicing or routine maintenance work performed at the PROPERTY.   MANAGER may not contract with any affiliate of MANAGER for the performance of services for the PROPERTY without full disclosure to, and the prior written approval of, OWNER, which approval may be granted or withheld in OWNER'S sole discretion.   Without limiting the foregoing, MANAGER'S obligations shall include:

     (i)     unless otherwise agreed to by OWNER, MANAGER shall require that all service providers brought onto the PROPERTY have insurance coverage at the service provider's expense in the amounts provided in this Agreement or other insurance guidelines provided to MANAGER by OWNER;

     (ii)     MANAGER shall obtain and retain, or cause to be obtained and retained, for OWNER'S benefit or, at OWNER'S request, deliver to OWNER, all warranties and guaranties of workmanship and materials for the benefit of OWNER as are available from any service provider. All such warranties and guaranties shall be delivered to MANAGER, as OWNER'S representative, not later than the time the service provider makes an application for final payment and a copy of all such warranties and guaranties shall be retained by MANAGER;

513420 000014 8118192.1

EXHIBIT 1

(iii)   MANAGER shall obtain, or cause to be obtained, for OWNER, all available rebates, discounts or other incentives, if any, pertaining to any work performed at or on behalf of the PROPERTY and any such rebates, discounts or other incentives received by MANAGER shall inure to and belong to OWNER; and

(iv)   MANAGER shall ensure that no payments are made to a service provider unless the work performed for such payment was performed in a good and workmanlike manner, in accordance with the applicable Service Contract.  MANAGER shall carefully review all bills received in connection with the maintenance of the PROPERTY and the leasing of the units at the PROPERTY and shall pay such bills promptly. Any late fees or other penalties imposed as a result of MANAGER'S failure to pay such bills in a timely manner shall be borne by MANAGER with no right to reimbursement therefor.  Upon OWNER making sufficient funds available to MANAGER, MANAGER shall pay all bills within such time as will entitle MANAGER to a rebate or discount and shall deliver to OWNER any such rebate or discount received.  In connection with the foregoing, MANAGER shall obtain all necessary receipts, releases, waivers, discharges and assurances necessary to keep the PROPERTY free from mechanics' and materialmen's liens and other claims, all of which documentation shall be in such format as is reasonably required by OWNER.

**(e)**   Provide weekly leasing reports, bi-weekly leasing status calls and normal day-to-day accounting services and maintain property account records necessary to facilitate annual reports or audits by an independent certified accountant, including payment of all bills, payment of payrolls, preparation of payroll tax reports, maintenance of a general ledger, preparation monthly of a balance sheet and statement of income and expenses and preparation annually of a proposed budget for the ensuing year to be presented to OWNER for review and approval by no later than ninety (90) days prior to the end of each calendar year.  MANAGER will also provide such other property reports as OWNER may reasonably request, including, without limitation, the following financial statements: (i) rent roll and monthly statement (along with cash flow statement) within 15 days after the end of each month; (ii) quarterly statement within 15 days after the end of each calendar quarter; and (iii) annual statement within 15 days after the end of each calendar year.  OWNER will consider the proposed budget and then will consult with MANAGER in the 90 day period prior to the commencement of the next calendar year in order to agree on the yearly budget.  OWNER may accept or reject such proposed budget in its sole discretion and may require any changes to the proposed budget as it deems reasonably necessary.  OWNER shall specify in writing to MANAGER in reasonable detail the basis for any rejection of or changes requested to the proposed budget.  MANAGER shall cooperate with OWNER and revise the proposed budget as necessary to incorporate any comments or changes requested by OWNER.  Once OWNER has approved a proposed budget, such budget shall become the "**ANNUAL BUDGET**" hereunder.  MANAGER will maintain adequate and complete books and records, papers, accounts, contracts, files, including complete and current files of all Service Contracts, leases, insurance policies, correspondence, receipts, bills and vouchers, and all other papers and documents pertaining to the PROPERTY, all of which will be the property of OWNER and OWNER will have access to the same at all reasonable times.  As of the date hereof, such books and records are maintained at

7

MANAGER's office located at the address set forth in the preamble hereto. MANAGER shall provide written notice to OWNER of any change in the location of all such records within five (5) business days following such change. MANAGER, at the request of OWNER, shall cooperate with and assist the independent accountant, in the preparation of OWNER'S federal, state and local income tax returns.

**(f)**     Bill, collect and receive in the name of the OWNER all rents, assessments and charges due or to become due from tenants or occupants of rental units located on the PROPERTY and deposit such rents in the Operating Account in accordance with Section 4(g) below.  MANAGER shall retain, or cause to be retained, qualified legal counsel, which legal counsel shall be subject to OWNER'S approval (provided, however, no additional approval shall be required for legal counsel that is designated on the Annual Budget), in its sole and absolute discretion, to institute all necessary legal actions or proceedings for the collection of rent or other income from the PROPERTY, or for the eviction or dispossessing of tenants or other Persons therefrom.

**(g)**     Subject to the requirements of any financing documents applicable to OWNER or the PROPERTY, MANAGER shall establish an account (the "**OPERATING ACCOUNT**") for the PROPERTY at Wells Fargo Bank, National Association or any other banking institution approved by OWNER, which Operating Account shall be in the name of OWNER and under the control of MANAGER.  Within three (3) Business Days of receipt, MANAGER shall deposit all rent and other amounts received from the operation of the PROPERTY in the Operating Account.  Funds in the Operating Account shall not be commingled with the funds of any other person or entity and MANAGER shall not employ such funds in any manner except as permitted hereunder.  MANAGER shall pay from funds available in the Operating Account all expenses incurred in connection with the management of the PROPERTY in accordance with this Agreement.

Subject to the requirements of any financing documents applicable to OWNER or the PROPERTY, MANAGER shall establish an account (the "**SECURITY DEPOSIT ACCOUNT**") for the PROPERTY at Wells Fargo Bank, National Association or any other banking institution approved by OWNER, which Security Deposit Account shall be in the name of OWNER and under the control of MANAGER.  Within one (1) Business Day of receipt, MANAGER shall deposit all security deposits received from tenants at the PROPERTY in the Security Deposit Account.  Funds in the Security Deposit Account shall not be commingled with the funds of any other person or entity and MANAGER shall not employ such funds in any manner except as permitted hereunder.  MANAGER shall ensure that the Security Deposit Accounts complies will all laws governing security deposits.  Notwithstanding the foregoing or anything else herein to the contrary, in lieu of establishing the Security Deposit Account, if permitted under applicable Alabama law and pursuant to the loan documents governing any financing provided for the PROPERTY, MANAGER may obtain and post a bond for all security deposits to be held in connection with the PROPERTY in accordance with applicable law, and after posting said bond, MANAGER may commingle, in the OPERATING ACCOUNT, and use any and all funds received as security deposits from tenants of the PROPERTY.

**(h)**     Advertise the PROPERTY or any part thereof for rent in accordance with rental terms; display signs thereon and rent the same; cause references of prospective

tenants to be investigated; sign leases for terms not less than one (1) year and renew and/or cancel the existing leases and prepare and execute the new leases without additional charge to OWNER; terminate tenancies wherein tenant is in default and to sign and serve such notices to institute and, subject to Section 4(f) above, prosecute actions to evict tenants and to recover possession of the premises; to sue for and recover rent; and, to settle, compromise, and release such actions or suits, or reinstate such tenancies.   OWNER shall reimburse MANAGER for all expenses of litigation including reasonable attorney fees, filing fees and court costs which MANAGER does not recover from tenants.  All leases shall be on the form attached hereto as Exhibit A or any other form approved by OWNER and shall comply with the terms of all financing documents applicable to OWNER or the PROPERTY.  OWNER, with MANAGER's advice, will set the terms on which it wishes MANAGER to negotiate with existing and prospective tenants.  MANAGER will not negotiate to lease any space in the PROPERTY to itself or to any of its affiliates or subsidiaries without prior written approval of OWNER.  MANAGER shall carefully investigate all prospective tenants pursuant to policies approved by OWNER, which may include, without limitation, evaluation of the background and creditworthiness of such persons or entities.  Among other things, MANAGER will review the tenant's ability to pay rent and rental history with references from prior landlords. MANAGER and OWNER agree that there will be no discrimination against any persons by reason of age, race, color, religion, creed, handicap, sex or national origin.

**(i)**   Handle all complaints and requests from third parties, including tenants at the PROPERTY, and shall record each in a systematic fashion in order to show the action taken.  MANAGER shall notify OWNER of any complaint involving claims or criminal conduct or damages in excess of $5,000 within three (3) Business Days of MANAGER's receipt of notice or actual knowledge of such complaint.

**(j)**   Employ, either directly or through an affiliate (such affiliate, the "**EMPLOYER**"), at all times during the term of this Agreement, a staff of commercially reasonable size that is made up of capable personnel for the proper management of the PROPERTY in accordance with the terms of this Agreement.  Such personnel shall be employees of MANAGER or Employer, as applicable, and all matters pertaining to such personnel, including their employment, supervision, compensation, promotion and discharge, shall be the responsibility of MANAGER or Employer, as applicable.  Except for any on-site employees or personnel included within the Annual Budget whose salaries, wages and other benefits (including fringe benefits) shall be fully reimbursed to MANAGER by OWNER or the PROPERTY, all salaries, wages and other compensation of any other personnel employed by MANAGER or Employer hereunder, including fringe benefits, shall be deemed to be the sole cost and expense of MANAGER or Employer, as applicable, with no right to reimbursement therefor (and MANAGER or Employer, as applicable, shall be solely responsible for, with no right to reimbursement therefor, all payroll and other taxes and all other deductions paid or made or required by applicable laws, and for preparing and filing all returns and other documents required under applicable laws).  MANAGER or Employer, as applicable, shall be solely responsible for its personnel in the event of the termination of this Agreement.  MANAGER or Employer, as applicable, shall notify OWNER of any pending changes in MANAGER's or Employer's, as applicable, personnel for the PROPERTY at least five (5) Business Days prior to such changes (or, in MANAGER's reasonable discretion, with five (5) days after

513420 000014 8118192.1

EXHIBIT 1

such changes if immediate personnel changes are required) if such personnel constitutes one of the following positions: regional manager, property manager or head of maintenance.  While the parties acknowledge that OWNER retains no authority to direct MANAGER's, Employer's, or other service providers' personnel decisions, OWNER retains the authority to instruct MANAGER to remove any of MANAGER's employees from working at or for the PROPERTY in the event such employee(s) is (are) determined to have misappropriated any funds of OWNER or is (are) otherwise determined to be found guilty of/liable for gross negligence, willful misconduct, fraud or malfeasance in connection with MANAGER's duties hereunder (or Employer's or other service providers' duties under their respective agreements). MANAGER or Employer, as applicable, will ensure that all of its employees involved in the management of the PROPERTY have successfully passed a background check (e.g. no criminal convictions) and an illegal drug screen.

(k)     In exercising its responsibilities under this Agreement, shall comply and use commercially reasonable efforts to cause compliance by, and cause Employer to cause and use reasonable efforts to cause compliance by, all service providers with all applicable laws concerning (i) workers' compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and all other applicable laws affecting employers, and (ii) the management of the PROPERTY, including, without limitation, laws regarding the protection of personal data and non-discrimination in connection with the rental of the units.  MANAGER or Employer, as applicable, shall pay or use commercially reasonable efforts to cause all service providers to pay all federal, state and local employment taxes, social security taxes and any other taxes required to be paid by employers in Alabama.  MANAGER or Employer, as applicable, shall remit all such taxes to the appropriate agency on or before their respective due dates and in accordance with Section 7 herein.

(l)     Properly supervise, or cause Employer to properly supervise, the work of its managers, assistants and all other employees as well as all services providers engaged by MANAGER on behalf of OWNER.  MANAGER or Employer, as applicable, covenants that (1) all of its employees that are involved in the day-to-day management of the PROPERTY or will be on the PROPERTY shall have successfully passed a background check (e.g. no criminal convictions) and an illegal drug screen, and (2) it has and will maintain policies in place, and provide training for such employees, with respect to all applicable laws in connection with the performance of its obligations under the this Agreement, including, without limitation, laws regarding the protection of personal data and laws regarding non-discrimination in the rental of housing.

(m)     Obtain and maintain on MANAGER's behalf Commercial General Liability Insurance on an occurrence form for bodily injury, property damage, personal injury and advertising injury with limits of Three Million Dollars ($3,000,000) combined single limit each occurrence and Three Million Dollars ($3,000,000) from the aggregate of all occurrences within each policy year.  The policy shall contain, if available, provisions giving OWNER and its designated representatives at least thirty (30) Business Days' prior written notice of cancellation of coverage and name OWNER and its designated representatives as additional insureds.  MANAGER will provide OWNER and its designated representatives with evidence of all required coverages. If MANAGER is advised of any material change in coverage being made by any carrier, MANAGER shall so notify OWNER and its designated representatives in

writing within three (3) Business Days.  Such insurance shall be placed with reputable insurance companies licensed or authorized to do business in the state in which the PROPERTY is located with a minimum Best's rating of A-X.  The cost of all insurance set forth above shall be the sole cost and expense of MANAGER with no right to reimbursement therefor.

    (i)    OWNER and MANAGER shall each cooperate with and provide reasonable access to the PROPERTY by representatives of insurance companies and insurance brokers or agents at reasonable times and upon reasonable notice.  MANAGER shall comply with all requirements of all insurers that are not personal to MANAGER, without additional cost to MANAGER.

    (ii)    Within forty-eight (48) hours after notification of their occurrence, MANAGER shall investigate, or cause to be investigated, and shall make, or cause to be made, a full, written report to OWNER as to (A) all accidents or claims for damages for injury to person or property occurring at the PROPERTY or arising out of the ownership and maintenance of the PROPERTY, and (B) all damage to or destruction of the PROPERTY which gives rise to, or may give rise to, a claim by any third party, including the estimated costs of repair, and MANAGER shall prepare, or cause to be prepared, for approval by OWNER all reports required by any insurance company in connection with any such accident, claim, damage or destruction.  Within one (1) Business Day following receipt, MANAGER shall forward simultaneously to OWNER and the insurance broker any summons, subpoena or other legal document served upon MANAGER relating to actual or alleged potential liability of OWNER.  MANAGER shall, and shall cause all applicable parties to, cooperate with OWNER with respect to any claim which may arise under any insurance policy.  MANAGER shall take no action, or permit any party to take any action, (such as, but not limited to, admission of liability) that might operate to bar OWNER from obtaining any protection afforded by any policy, or that might prejudice OWNER and its defense to any claim based on such loss, damage or injury.

MANAGER shall also obtain and keep in force, at the OWNER's expense, (i) worker's compensation insurance up to the statutory limit, including broad form all states coverage and employer's practices liability of at least $500,000 with respect to the Site Employees, and (ii) a fidelity bond/crime insurance in an amount at least equal to one month's income from the Property to cover all employees (whether on-site or off-site) employed by the MANAGER who shall be responsible for handling any moneys belonging to the OWNER which come under custody or control of the MANAGER.

513420 000014 8118192.1

EXHIBIT 1

**(n)** Subject to OWNER's prior approval, establish and maintain during the term of this Agreement policies and procedures for the efficient management of the PROPERTY and leasing guidelines with respect to the leasing of the units.  Such policies and procedures and guidelines shall be in compliance with all Requirements and consistent with those for the management and leasing of properties located in Alabama that are of similar size, quality and nature of the PROPERTY.  MANAGER shall use best efforts to ensure that such policies and procedures are observed by its managers, employees and service providers, subcontractors and independent contractors.

**(o)** After giving OWNER at least five (5) Business Days' prior written notice thereof, take, or cause to be taken, all necessary steps authorized in writing by OWNER to prevent the creation of, and to remove, any claim for lien, encumbrance, or security interest which attaches to the PROPERTY or any portion of the PROPERTY as a result of a breach by MANAGER in the performance of MANAGER's obligations under this Agreement.

**(p)** Furnish to OWNER, within three (3) Business Days after receipt by MANAGER, any and all legal, violation, issuance and other notices (each a "**LEGAL NOTICE**") received by MANAGER affecting or in connection with the PROPERTY, whether from any governmental or regulatory body, insurance body or other entity, and, if applicable, all notices from any mortgagee claiming any default in any mortgage on the PROPERTY and any other notice from a mortgagee.

**(q)** Obtain and keep in full force and effect, or cause to be obtained and kept in full force and effect, all licenses, permits, consents and authorizations that may be necessary for the maintenance or management of the PROPERTY or for the proper performance by MANAGER of its duties and obligations under this Agreement.  The cost of keeping in full force and effect all such licenses, permits, consents and authorizations shall be reimbursed to MANAGER by OWNER or the PROPERTY.

**(r)** At the expense of OWNER, in accordance with the then-current Annual Budget, pay and perform on behalf of OWNER all of OWNER'S reasonable obligations with respect to the day-to-day operations of the PROPERTY so requested by OWNER in connection with any financing relating to OWNER or the PROPERTY.  Each of MANAGER and OWNER shall promptly notify the other upon learning of any default, or event of default or event which, with the giving of notice or the passage of time or both, might constitute a default or an event of default, under any such financing. MANAGER shall consult with OWNER concerning the action to be taken with respect thereto and, at the expense of OWNER, take such action as OWNER shall direct.  Without the consent of OWNER, MANAGER (i) shall not modify, or in any way alter, the provisions of any financing and (ii) shall not take such action, or omit to take any action or give any notice, the taking, omission or giving of which results in the occurrence of a default by OWNER under any financing document provided to MANAGER.  MANAGER shall cooperate with OWNER to prepare all information, schedules and reports necessary to calculate and/or support the covenants concerning the PROPERTY in any financing documents encumbering the PROPERTY; this shall include, but not be limited to, preparing historic income and expense data for financings and providing debt covenant compliance information including, but not limited to, annual budgets and debt coverage ratio calculations (but excluding audited financial statements, which shall be prepared by OWNER's

accountant or auditor).

**(s)**   In regard to any potential sale of the PROPERTY or any portion of the PROPERTY, cooperate with OWNER during the due diligence process and, as requested by OWNER, perform the following duties and obligations during and after the sale process:

    (i)   Process due diligence requests of potential buyers, including financial statements, service contracts, and supporting billing and disbursement documentation;

    (ii)   Prepare and provide schedules and support for closing adjustments;

    (iii)   Prepare final accounting for the sale of the PROPERTY or the applicable portion thereof and, as necessary, participate in the fieldwork and preparation of the financial statements or audited financial statements to be prepared by OWNER'S accountant or auditor. The fieldwork includes, but is not be limited to, providing access to the PROPERTY'S books and records and having qualified personnel available to answer any questions which may arise during the fieldwork;

    (iv)   As necessary, MANAGER shall prepare the final expense reconciliations regarding the proration of expenses for the sale of the PROPERTY or the applicable portion thereof; and

    (v)   If the sale is for all, but not less than all, of the PROPERTY, upon OWNER'S request, MANAGER shall continue for up to six (6) months after the closing of the sale to perform such residual services as may be reasonably requested by OWNER including, without limitation, making post-closing calculations and preparing reports as may be required for accounting purposes or by the agreement to sell the PROPERTY, and such other matters related to the PROPERTY and the sale of the PROPERTY as remain to be completed after the Closing.

For the services described in Section 4(s)(v) above, MANAGER shall receive a fee as agreed by the parties for each month (or portion thereof) that it continues to perform such services at OWNER'S may reasonably request. Except as required by the immediately preceding sentence and as may be agreed to in writing by OWNER and MANAGER, MANAGER shall not be entitled to any compensation, commissions or other fee, with respect to any sale or financing relating to the PROPERTY or any interest therein or any obligation or debt relating to the PROPERTY, except to the extent of any accrued and unpaid Management Fee or Construction Supervision Fee that may be due to MANAGER pursuant hereto.

**(t)**   To the extent requested by OWNER, in addition to the requirements and obligations set forth in this Agreement, MANAGER shall implement all of OWNER'S reasonable decisions and requests, whether same are given orally or in writing.

**(u)**   Notwithstanding any provision of this Agreement to the contrary, MANAGER shall not, nor permit any agent or subcontractor of MANAGER to, without the prior written approval of OWNER in each instance:

    (i)   make any expenditure or incur any obligation on behalf of OWNER, except for (A) expenditures or obligations approved by OWNER, and (B) expenditures made and obligations incurred directly pursuant to the then-current Annual Budget and as permitted by this Agreement

(including any divergence therefrom permitted hereunder), and (C) Emergency Expenditures;

(ii)    convey or otherwise transfer, pledge or encumber any property or other asset of OWNER;

(iii)    retain architects, engineers, attorneys, accountants or other professionals on behalf of OWNER, except contractors, subcontractors and any other professionals expressly authorized to be contracted by MANAGER pursuant hereto;

(iv)    institute or defend lawsuits or other legal proceedings on behalf of OWNER, except as to eviction and/or collection actions against delinquent tenants;

(v)    pledge the credit of OWNER;

(vi)    obligate OWNER for the payment of any fee or commissions to any real estate agent or broker, except as may be provided in any Annual Budget;

(vii)    sign any leases or contracts of sale, except as to residential leases with tenants under the terms set forth herein; or

(viii)    borrow money or execute any promissory note or other obligation or mortgage, deed of trust, security agreement or other encumbrance in the name of or on behalf of OWNER (provided, however, the parties acknowledge that entering into standard contracts for trade payables incurred in the ordinary course of the day-to-day operations of the PROPERTY shall not constitute borrowing money hereunder).

The limitations set forth in this Section 4(u) shall be in addition to restrictions on the authority of MANAGER under this Agreement.

5.    **MANAGER'S COMPENSATION**:  The OWNER agrees to pay MANAGER three percent (3%) of the monthly Gross Receipts from the operation of the PROPERTY during the period this Agreement remains in full force and effect (hereinafter called the "**MANAGEMENT FEE**".  Gross Receipts are all amounts received from the operation of the PROPERTY including, but not limited to, rents, late charges and/or bad check charges collected, laundry income and fees but does not include deposits or advance rents collected unless and until such deposits or advance rents are forfeited to or earned by OWNER, as applicable.  It is expressly agreed that Gross Receipts shall exclude the following items:  (i) any and all proceeds payable to OWNER from the sale, refinancing or other disposition of all or any part of the PROPERTY; (ii) any and all proceeds payable to OWNER by reason of any hazard, title or other insurance policies (excluding any rent interruption proceeds relating to the PROPERTY; provided, however, to the extent MANAGER is separately paid by insurance proceeds under such business interruption insurance, the proceeds paid to OWNER on account of such units that cannot be leased shall not be used in calculating Gross Receipts); (iii) the proceeds of any taking by condemnation or eminent domain by a public or quasi-public authority of all or any part of the PROPERTY; (iv) interest on security deposits or other interest income; (v) refunds of any tax, charge or other amount paid in connection with the ownership, management and/or maintenance of the PROPERTY; (vi) sales, excise or other taxes collected but payable in respect of the ownership, management and/or maintenance of the PROPERTY; (vii) refunds, rebates, discounts or other credits received by MANAGER or OWNER incident to purchases, contracts or other arrangements entered into pursuant to this Agreement for the account of OWNER; (viii) amounts received in settlement of any claims other than to the extent constituting payment of unpaid rent; and (ix) non-operating revenue.  The OWNER agrees to pay all reasonable costs and expenses incurred in

accordance with the terms of this Agreement by MANAGER in the performance of its duties to the extent set forth in Section 4(a) above.  The Management Fee shall be payable monthly in arrears by MANAGER withdrawing the Management Fee from the Operating Account.  In the event that funds on deposit in the Operating Account are not sufficient to make any payment of the Management Fee, MANAGER shall submit in writing a request for payment to OWNER and such payment shall be made no later than thirty (30) days following the date on which such compensation and reimbursement is requested. Additionally, MANAGER shall be paid and earn a construction and renovation supervision fee (hereinafter called the "**Construction Supervision Fee**") equal to eight percent (8%) of the total costs of construction and improvements as set forth in the renovation budget approved by OWNER and MANAGER.  The Construction Supervision Fee shall be paid monthly in equal payments from renovations funds as same may be drawn from any reserves thereof or otherwise made available by OWNER.   In the event that the renovations funds available, if any, are not sufficient to make any payment of the Construction Supervision Fee, MANAGER shall submit a request for payment to OWNER and such payment shall be made no later than thirty (30) days following the date on which such compensation and reimbursement is requested.

MANAGER agrees to subordinate its fees to any debt service payable in connection with any financing on the PROPERTY, on customary terms and conditions that are otherwise reasonably acceptable to MANAGER.

6.  **LIABILITY AND INDEMNIFICATION**:  The duties performed by MANAGER hereunder shall be performed as MANAGER for the OWNER, and all obligations or expenses incurred in accordance with the terms of this Agreement in the performance or MANAGER'S duties and undertakings shall be for the account, on behalf of, and at the expense of the OWNER, except as otherwise set forth in this Agreement.  MANAGER shall not be obligated to make any advance to or for the account of OWNER or to pay any sum, except as provided in this Agreement, out of funds in the Operating Account or provided by OWNER or from its tenants, nor shall MANAGER be obligated to incur any liability or obligation on account of the OWNER without assurance that the necessary funds for the discharge thereof will be provided.  Subject to the following paragraph, OWNER shall indemnify MANAGER for any claim or liability arising from or related to MANAGER'S activities or responsibilities undertaken in accordance with the terms of this Agreement on behalf of the OWNER.

Provided however, OWNER shall not be liable to MANAGER for obligations or expenses incurred by MANAGER not in accordance with the terms of this Agreement nor for claims or damages arising from the gross negligence, willful misconduct or omissions of MANAGER.  MANAGER shall indemnify and hold OWNER harmless from any claims, demands or liabilities incurred by MANAGER that are the result of either (i) action or inaction by MANAGER not in accordance with the terms of this Agreement or (ii) arising from MANAGER'S gross negligence, willful misconduct or omissions.

MANAGER will exercise sufficient control over accounting and financial transactions as is reasonably required to protect OWNER's assets from theft, error or fraudulent activity on the part of MANAGER's associates or employees.  Losses arising from such instances will be borne by MANAGER and shall include, but not be limited to:

(a)  Theft of assets by MANAGER's associates or employees;

(b)  Penalties, interest, or loss of vendor discounts due to delay in payment of invoices, bills or other like charges;

(c)  Overpayment or duplicate payment of invoices arising from either fraud or error;

(d)  Overpayment of labor costs arising from either fraud or error;

(e)  A sum equal to the value of any form of payment from providers to MANAGER's employees or associates arising from the purchase of goods or services for the PROPERTY;

(f)  Unauthorized use of facilities by MANAGER'S employees or associates; and

(g)  costs and expenses incurred in connection with claims brought by third parties arising out of or incidental to any act or omission of MANAGER or MANAGER'S agents or employees, constituting fraud, gross negligence, willful misconduct or a breach of this Agreement.

7.  **PAYMENTS AND TAXES**:  MANAGER shall pay, out of the proceeds from the PROPERTY held in the Operating Account, the mortgage indebtedness, general taxes (in accordance with the paragraph below), special assessments, or fire, or any other insurance premiums and if the funds on deposit in the Operating Account and received from revenues of the Property are at any time insufficient to pay any of the foregoing, MANAGER shall immediately notify OWNER.  In no event shall MANAGER be required to advance its own money in payment of any such indebtedness, taxes, assessments or premiums.

MANAGER shall arrange with the local taxing authorities to have all bills for real property taxes and assessments initially sent to MANAGER or OWNER'S tax consultant as directed by OWNER.  MANAGER shall (i) monitor, or cause to be monitored, the real estate tax assessments of the PROPERTY and the reasonableness thereof in comparison with the assessments of similar properties, (ii) advise OWNER of any material increase in real estate taxes, (iii) consult with, and make recommendations to, OWNER concerning the real estate tax assessments of the PROPERTY and (iv) at the expense of OWNER, take such action with respect thereto as OWNER may direct (all in cooperation and consultation with legal counsel or such other consultants as OWNER may direct).  MANAGER shall forward copies of all tax bills, as well as all notices of changes in assessment, to OWNER within three (3) Business Days after receipt.  Upon OWNER making sufficient funds available to MANAGER, MANAGER shall timely cause all such bills to be paid and shall timely process all paperwork required to be submitted therewith to the local taxing authority, unless otherwise directed by OWNER.  Any late fees or other penalties imposed as a result of MANAGER'S failure to pay such taxes in a timely manner shall be borne by MANAGER with no right to reimbursement therefor.

8.  **MAJOR REPAIRS**:  Except for emergency repairs as provided in Paragraph 4(b) above, the OWNER expressly withholds from MANAGER any power or authority to make any structural changes in any building or to make any other major alterations or additions in or to any such building or equipment therein, or to incur any expense chargeable to the OWNER other than expenses related to exercising the express powers above vested in MANAGER without the prior written direction of OWNER.

9.  **COMPLIANCE**:

(a)  MANAGER shall be responsible for full compliance with all Requirements, provided that OWNER provides or makes available sufficient funds to bring and/or maintain the PROPERTY in compliance, such that in no event shall MANAGER be required to expend its own funds in order to comply with any Requirements.  Manager shall perform, or cause to be performed, regular and systematic inspections of the PROPERTY in order to comply with all Requirements and assure proper maintenance of the PROPERTY.  MANAGER shall notify OWNER in writing of any violation of any Requirement within three (3) Business Days of MANAGER obtaining knowledge of such violation and shall obtain OWNER'S prior written approval before authorizing any expenditure to correct a violation of any Requirement, unless in MANAGER'S reasonable opinion an Emergency Expenditure is necessary.  OWNER shall have the right to contest any alleged violation of any Requirement.  MANAGER acknowledges that it has been advised of and represents, warrants and covenants that it has complied, and will at all times during the term of this Agreement comply, with all applicable laws relating to the PROPERTY and MANAGER'S activities at the Property, including, but not limited to, applicable laws relating to asset or rental managers.

(b)  With respect to this Agreement, MANAGER shall (and MANAGER shall use commercially reasonable efforts to cause its subcontractors and independent contractors to) not engage in any conduct or practice which discriminates against any employee or applicant for employment because of his or her race, color, gender, religion, national origin, marital status, physical handicap, sex, sexual preference or age in the performance of this Agreement or in any connection with the PROPERTY.  MANAGER shall (and MANAGER shall use commercially reasonable efforts to cause its subcontractors and independent contractors to) ensure that the evaluation and treatment of their employees and applicants for employment are free of such discrimination.  MANAGER shall use best efforts to include the nondiscrimination and compliance provisions of this Section 8(b) in all subcontracts to perform work under this Agreement.

(c)  With respect to this Agreement, MANAGER shall not engage in any conduct or practice which discriminates against any potential renter or purchaser of a unit because of such person's race, color, gender, religion, national origin, marital status, physical handicap, sex, sexual preference or age.

10. **MANAGER AS INDEPENDENT CONTRACTOR**.  MANAGER shall for all purposes be deemed an independent contractor in its relationship with OWNER, and this Agreement is one in which MANAGER is engaged as an independent contractor in the business of managing properties.  All employment arrangements, therefore, are solely MANAGER'S concern and responsibility, and MANAGER shall have no authority to hire employees or establish an agency relationship for or on behalf of OWNER.  No charges shall be incurred for services performed by service providers engaged by MANAGER or for expenses related to any on-site employees unless OWNER expressly approved such charges in the then-current Annual Budget or such charges were otherwise approved in writing by OWNER.

11. **TERMINOLOGY**:  The term "MANAGER", in each place such term is used in this Agreement, shall include MANAGER'S trustees, agents, directors, officers, servants and employees.

12. **AGENCY**:  Subject to the terms of this Agreement, OWNER authorizes MANAGER to act as its agent in the management and operation of the PROPERTY and such authorization includes the authority of MANAGER to execute on behalf of OWNER all leases, rental agreements, contracts for work and services and equipment leases associated with the PROPERTY which are specifically included in the then-applicable Annual Budget or are in accordance with written authorization and instructions given to MANAGER by OWNER for any one item expenditure in excess of Two Thousand and No/100 Dollars ($2,000.00).

All documents executed by MANAGER and all transactions undertaken by MANAGER in accordance with the terms of this Agreement in the exercise and fulfillment of the duties, responsibilities and authority which it assumes under this Agreement shall be in the legal capacity of agent for OWNER, whether entered into in MANAGER's own name or in that of OWNER as its agent.

13. **RELEASE AND DEFAULT**:  OWNER and MANAGER hereby mutually release each other from any and all liabilities or responsibilities to the other or anyone claiming through or under them by way of subrogation or otherwise, for any claims, damages, losses or liabilities which shall have been caused by the fault or negligence of the other party, or anyone for whom such party must be responsible; provided, however, this release shall be effective and in force and effect only:  (a) with respect to claims, damages, losses or liabilities occurring during such time as the releaser's public liability, fire and extended coverage insurance policies contain a clause or endorsement that any such release shall not adversely affect or in any way impair said policies or prejudice the right of the releaser to recover thereunder; and (b) to the extent that any such claims, damages, losses and liabilities are covered by said insurance policies and the releaser has recovered thereunder.  Furthermore, the foregoing release shall not apply to any claims to the extent such released party has committed an action that is fraudulent, grossly negligent or an action that is found to constitute willful misconduct or a breach this Agreement.

OWNER and MANAGER shall request their respective insurance carriers to include in their policies said insurance clause or endorsement.  Each party shall pay any extra cost caused by the including of such a clause or endorsement in it respective policies.  OWNER shall provide MANAGER with a Certificate of Insurance for its insurance policies within ten (10) days of the date when the last of the two (2) shall execute this Agreement.

In the event of any default by either party hereunder (a "**Defaulting Party**") for which the foregoing release may not be applicable (nothing herein limiting or diminishing said release), then the sole and exclusive remedy of the other party (the "**Non-Defaulting Party**") in such instance or event shall be to terminate or cancel this Agreement in accordance herewith, except in the event of fraud, gross negligence or the willful misconduct of the Defaulting Party, in which case, the Defaulting Party's liability thereunder shall be limited to the Non-Defaulting Party's actual damages specifically sustained in connection therewith (and in no event for any consequential, speculative or punitive damages).

14.  **INVALIDITY**:  In the event any term or provision contained in this Agreement, or any portion hereof, is held invalid, void or unenforceable by any court of competent jurisdiction, the remaining portions of this Agreement shall, nevertheless, be and remain in full force and effect.

15.  **ASSIGNMENT**:  It is understood and agreed that MANAGER may not assign all or any portion of this Agreement or any of its rights, duties or obligations hereunder without the prior written consent of OWNER.  OWNER may assign this Agreement to any person acquiring the PROPERTY and upon such acquisition and assignment OWNER'S liability and obligation hereunder for sums due to MANAGER for services rendered from and after the date of acquisition shall terminate and shall be the obligation of the assignee. OWNER may also collaterally assign this Agreement to any lender pursuant to a loan entered into by OWNER in connection with the PROPERTY.

16.  **TERMINATION**:  Upon termination, the contracting parties shall account to each other with respect to all matters outstanding as of the date of termination in a timely manner as set forth below.  MANAGER shall give back to OWNER all books and records required to operate the PROPERTY.

Upon any termination of this Agreement, each party shall continue to be liable for its respective obligations which have accrued up to and including the termination date and shall promptly pay to the other all amounts due the other party under the terms of this Agreement.  Such payment shall be made as soon after the effective date of termination as such amounts are determinable.  Without limiting the foregoing, upon termination of this Agreement for any reason, MANAGER will deliver to OWNER the following with respect to the PROPERTY:

(i)  A final accounting with respect to the PROPERTY, reflecting the balance of income and expenses on the PROPERTY as of the date of termination to be delivered within 30 days after such termination, unless such time is extended, in writing, by OWNER;

(ii)  Any balance or monies of OWNER or tenant security deposits, or both, held by MANAGER with respect to the PROPERTY to be delivered immediately upon such termination;

(iii)  All records, contracts, leases, receipts for deposits, unpaid bills and all other papers or documents which pertain to the PROPERTY and such other documents as OWNER may request to be delivered immediately upon such termination.  MANAGER shall assign all licenses, permits and other

agreements, if any, to OWNER which MANAGER has entered into or obtained for the benefit of OWNER or the PROPERTY; and

(iv)    to the extent applicable, MANAGER and its affiliates shall surrender and deliver to OWNER any portion of the PROPERTY occupied by MANAGER or its affiliates within twenty-four (24) hours after such termination.

MANAGER shall furnish all such information and take all such action as OWNER shall require in order to effectuate an orderly and systematic termination of MANAGER's duties and activities under this Agreement.

17.    **OTHER AGREEMENTS**:  This Agreement shall constitute the entire Agreement between the contracting parties and no variance or modification thereof shall be valid and enforceable, except by supplemental agreement in writing, executed and approved in the same manner as this Agreement.

18.    **NOTICES**:  Any and all notices, objections, requests or other communications required or permitted by this Agreement or by law to be served on or given to any party hereto by any other party hereto shall be in writing and shall be deemed duly served and given when personally delivered to the party to whom it is directed, or, in lieu of such personal service, when deposited in the United States mail system, first class postage prepaid and properly addressed to the addresses set forth on the signature pages for such party.  Unless earlier received, mailed notices shall be effective seven (7) days after mailing.  Any party may change its address for the purposes of this paragraph by giving written notice of such change to the other party or parties in the manner provided for in this paragraph.

19.    **SURVIVAL OF WARRANTIES; REPRESENTATIONS AND AGREEMENTS**:
Unless expressly provided to the contrary, all representations, covenants, warranties and agreements contained herein shall survive for the maximum period permitted by law.

20.    **APPLICABLE LAW AND VENUE; JURY TRIAL WAIVER**:  This Agreement is being executed and delivered in the State of Alabama and shall be construed and enforced in accordance with the laws of the State of Alabama.  Venue for any action hereunder shall be in the appropriate court of Jefferson County, Alabama.

THE PARTIES AGREE THAT THEY HEREBY IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY IN ALL DISPUTES BETWEEN ANY OF THE PARTIES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

21.    **CAPTIONS**:  The captions of this Agreement are inserted only for purposes of convenient reference and in no way define, limit or prescribe the scope or intent for this Agreement or any part hereof.

22.    **CONSTRUCTION**:  All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement or any paragraph or clause herein may require the same as if such words had been fully and properly written in the required number and gender.  This Agreement constitutes the negotiated joint effort of the parties and shall not be construed more strongly against any party.

20

23. **WAIVER**:  The failure to take action against any breach of this Agreement (or any warranty or representation contained in this Agreement) by any party or failure by OWNER to insist upon strict performance of any obligation, covenant, agreement, term or condition of this Agreement, shall not constitute a waiver of any rights or remedies under this Agreement. A written waiver of any breach shall not constitute a waiver of any subsequent breach either of the same or any other provision of this Agreement.  A waiver of or failure to enforce any condition, covenant or agreement by any party shall likewise not be construed to affect, influence or create a precedent relative to any right of a party to enforce the same or any similar provision in the future.

24. **AMENDMENT**:   This Agreement may not be modified or amended, except by an agreement in writing signed by each of the parties hereto.  The parties may waive any of the conditions contained herein or any of the obligations of any other party hereunder, but any such waiver shall be effective only if in writing and signed by the party waiving such conditions or obligations.

25. **AUTHORITY**:  Each person executing this Agreement warrants and represents that he is fully authorized to do so.

26. **ATTORNEYS' FEES**:  In the event any party files a suit in connection with this Agreement, any provisions contained herein or any documents now or hereinafter executed pursuant to or in furtherance of this Agreement, then the party which prevails in such action shall be entitled to recover, in addition to all other remedies or damages, reasonable attorneys' fees (including appellate proceedings) and court costs incurred in such suit.

27. **MULTIPLE COUNTERPARTS**:  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

28. **TIME IS OF THE ESSENCE**:  Except as may be elsewhere specifically provided, time is hereby expressly made of the essence with respect to each and every term and provision of this Agreement, including, but not limiting the generality of the foregoing, with respect to each and every time constraint and deadline imposed by the terms of this Agreement.

29. **DATES**: If, pursuant to this Agreement, any date indicated herein falls on an official United States holiday or a Saturday or Sunday, the date so indicated shall mean the next business day following such date.  The date of this Agreement shall for all purposes be the date on which it is fully executed by the last of the parties unless another effective date is specifically set forth elsewhere in this Agreement.

30. **AGREEMENT NOT RECORDABLE**:  Neither this Agreement nor any memorandum, short form agreement or other notice of this Agreement shall be recorded in the office of the Clerk of any Court of the State of Alabama or elsewhere.

31. **CONFIDENTIALITY; NON-DISCLOSURE**:   Unless otherwise approved in writing by OWNER, MANAGER agrees to keep confidential and not to make any use of (other than for purposes of filing each party's tax returns or for other routine matters required by applicable Law) or to disclose to any person or entity, any information or matter relating to (i) any party and its affairs or (ii) the transactions contemplated by this Agreement and any agreement with an independent contractor or subcontractor, including but not limited to, all

information provided to MANAGER by OWNER or OWNER'S affiliate in connection with the business of OWNER or the PROPERTY, information relating to MANAGER'S operation of the PROPERTY, OWNER'S ownership of the PROPERTY, the identity of Koch (or any affiliate of Koch) and the fact it has made an investment in the PROPERTY and OWNER, the assets, liabilities, equity, income, investments or financial condition of the OWNER, or the profitability of the PROPERTY (collectively, "CONFIDENTIAL INFORMATION").

Notwithstanding the foregoing, MANAGER may make such disclosure to the extent that (i) the information being disclosed is publicly known or readily ascertainable by proper, lawful means at the time of any proposed disclosure by MANAGER, (ii) the information subsequently becomes publicly known through no act or omission of MANAGER, (iii) the information otherwise was in MANAGER'S possession prior to receipt from OWNER and came into MANAGER'S possession from a source who was not reasonably known by MANAGER to be prohibited from transmitting the information to MANAGER by a contractual obligation to OWNER, or becomes legally known to MANAGER other than through a third party with a contractual, legal, fiduciary or other obligation to keep such information confidential, (iv) such disclosure is required by law, or (v) such disclosure is in connection with any litigation or other proceeding between MANAGER and OWNER; provided further that OWNER will be permitted, after notice to MANAGER, to correct any false or misleading information which may become public concerning OWNER'S relationship to MANAGER or any Person in which OWNER holds, or contemplates acquiring, an investment.  Notwithstanding any provision in this Section 31 to the contrary, MANAGER may discuss, without any limitation, OWNER and the PROPERTY amongst itself and its shareholders, partners, members, trustees, directors, officers, employees, agents, representatives, counsel, accountants, consultants, lenders or other providers of financing to MANAGER and other professionals.

MANAGER may not disclose any Confidential Information to any person or entity for any internal or external marketing, customer relations, advertising or business development purpose, without the prior written consent of OWNER.  In addition, notwithstanding anything to the contrary set forth in this Agreement, MANAGER shall not, without the consent of OWNER, make any filing in connection with any investment in OWNER or the PROPERTY with any regulatory or governmental authority or agency that identifies OWNER unless required by applicable law.

If MANAGER loses or makes or becomes aware of any unauthorized use or disclosure of any Confidential Information, MANAGER shall immediately notify OWNER and use its reasonable efforts to (i) retrieve the lost or wrongfully disclosed Confidential Information, and (ii) discontinue or stop any further unauthorized disclosure thereof.  Upon the expiration or earlier termination of this Agreement, MANAGER shall promptly return to OWNER all of OWNER'S Confidential Information that it holds, or certify to OWNER that it has destroyed the same in accordance with sound document destruction processes, except to the extent required by applicable law or any applicable regulatory requirements.

The provisions of this Section 31 will survive for a period of two (2) years from the date of expiration or earlier termination of this Agreement.

513420 000014 8118192.1
EXHIBIT 1

32.    **NATURE OF RELATIONSHIP**.  The nature of the relationship between OWNER and MANAGER is as set forth in this Agreement, and nothing herein contained shall be construed or interpreted to imply that the principals, officers or employees of MANAGER are employees of OWNER.   Except as otherwise provided herein, MANAGER acknowledges and agrees that it is acting solely as an independent contractor and not as a partner, joint venturer, employee or representative of OWNER.  MANAGER shall perform the services, or cause its officers and employees to perform the services, described in this Agreement.   Except as otherwise provided herein, neither MANAGER nor its officers, representatives or employees are granted any power to act as a legal representative of OWNER, to make a contract or legal commitment on behalf of OWNER or make any representations or warranties on behalf of OWNER, except as they may be authorized in writing to do so by OWNER.

**[Signatures to follow on next page]**

EXHIBIT 1

IN WITNESS WHEREOF, the parties have executed this Agreement, by their respective undersigned officers as of the date first above set forth.

**ASHFORD TOWNHOMES BIRMINGHAM LLC**, a Delaware limited liability company

By:    GK Birmingham LLC, its sole member

       By:    GCP Birmingham, LP, its managing member

           By:  GMSP, L.L.C., its general partner

              By: _____
              Name: Conrad Suszynski
              Title: Authorized Signatory

24

**MANAGER:**

**BLUE ROCK PARTNERS, LLC,**
**a Florida limited liability company**

By: _____

Print Name:   Reuven Oded

Title:   Manager

Notice Information:

9260 Bay Plaza Blvd Ste 501
Tampa, FL  33619

24

EXHIBIT 1



## <u>SCHEDULE I</u>

- Management Agreement dated of even date herewith between Stone Birmingham LLC, as owner, and Blue Rock Partners, LLC, as manager, relating to the property located at 700 Aspen Drive, Birmingham, Alabama 35209

- Management Agreement dated of even date herewith between Oak Birmingham LLC, as owner, and Blue Rock Partners, LLC, as manager, relating to the property located at 200 Robert Jemison Drive, Birmingham, Alabama 35209

- Management Agreement dated of even date herewith between Autumn Birmingham LLC, as owner, and Blue Rock Partners, LLC, as manager, relating to the property located at 860 Tyler Circle, Hoover, Alabama 35226

**EXHIBIT A**

**Form of Lease Agreement**

**(see attached)**



**APARTMENT LEASE** (AL)

| APARTMENT ADDRESS | | LEASE DATE | INITIAL LEASE TERM |
|---|---|---|---|
| | | | Beginning: |
| | | | Ending: |

| MONTHLY RENT | PRORATED RENT (If any) | SECURITY DEPOSIT | PET FEE (If any) | PREPARED BY |
|---|---|---|---|---|
| | | Security Deposit | | |

| RESIDENT NAMES | CHILDREN (Please list names and dates of birth) |
|---|---|

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

**ADDITIONAL AGREEMENTS (If any)**

*Monthly rent includes: water, sewer, trash, pest control services and cable tv services, to the extent applicable.

This is a lease between the above named Resident(s) and the below named Landlord for the apartment dwelling described above.  It is the entire agreement between Resident(s) and Landlord and may be modified only in writing.  As used in this lease, "you," or "resident(s)" means the resident (tenant) or residents whose names appear above.  If there is more than one resident, you are jointly and severally liable for any payments due to us. "Management," "we," "our," or "us" mean the Landlord.  "Premises" means the entire apartment community.  UPON EXECUTION OF THIS LEASE, YOU ACKNOWLEDGE THAT YOU HAVE READ AND AGREE TO ALL OF ITS PROVISIONS.  It was executed by the Resident(s) and the Landlord on the above "Lease Date".

RESIDENT SIGNATURE(S):                                        LANDLORD: _____

                                                                                          (Agent For Owner)

_____

_____

_____                               (ADDRESS)

                                                           By: _____

                                                                                          (Leasing Consultant)

**A.   SECURITY DEPOSIT:**
1.   Your security deposit will be held as indicated below: Deposited in a separate non-interest bearing account with: Wells Fargo Bank.
2.   Before you may occupy the apartment, you must pay us the full security deposit indicated above.  Your security deposit may not be applied by you as rent, but is a good faith deposit for your faithful fulfillment of each condition in this lease and as a contingency against any physical damage to the apartment or premises caused by you or your invitees.
(i)   Upon the vacating of the premises or termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 35 days to return the security deposit.  If the landlord does not refund the entire deposit, the landlord, within the 35-day period, shall provide the tenant an itemized list of amounts withheld.
(ii)   Upon vacating the premises, the tenant shall provide to the landlord a valid forwarding address, in writing, to which the deposit or itemized accounting, or both, may be mailed. If the tenant fails to provide a valid forwarding address, the landlord shall mail, by first class mail, the deposit or itemized accounting, or both, to the last known address of the tenant or, if none, to the tenant at the address of the property. Any deposit unclaimed by the tenant as well as any check outstanding shall be forfeited by the tenant after a period of 180 days.
**B.   OCCUPANCY:**  Only those persons whose names appear on this lease may occupy the apartment without our prior written consent except guests for not more than 7 consecutive days or 14 total days.  The apartment may be used solely for private housing.  If you will be absent for more than 14 days, you must notify us in writing.
**C.   DISCLOSURE:**  Blue Rock Partners, LLC Inc. as authorized to manage premises. Owner or agent for services is Blue Rock Partners, LLC Inc.
**D.   SUB-LET:**  You may not assign this lease or sublet any portion of your apartment.
**E.   PETS:**  No animals, birds or pets of any kind may enter or be kept in the apartment or premises without our written consent, except for any service animals that have been properly registered with Management.
**F.   USE:**  Apartment shall be used for residential purposes only and shall be occupied only by the persons named in Resident's application to lease. Apartment shall be used so as to comply with all state, county and municipal laws and ordinances.  Resident shall not use apartment, or permit it to be used, for any disorderly or unlawful purpose or in any manner so as to interfere with other Resident's quiet enjoyment of their apartments.

EXHIBIT 1

**G.** **UTILITIES:** You must obtain electric and gas service for your apartment, if separately metered. Unless separately metered, we supply water and sewer for normal usage. If separately metered, you must pay water and sewer charges each month within the payment grace period as additional rent. Landlord has the right to sub-meter, RUBS (Ratio Utility Billing System), or allocate, for water and/or sewer service to each apartment unit at landlords discretion. Thereafter, resident would be billed monthly for the cost of actual use of consumption and pay the cost of it to the landlord, his agent, or to his designated billing agent. We are not liable for interruption or malfunction in service of any utility due to any cause. If the interruption is our fault, your rent may be abated if service is not restored within a reasonable time. You may not occupy your apartment without electric service. Owner reserves the right to add bulk cable agreement at anytime during this lease.

**H.** **RENT, LATE RENT, RETURNED CHECKS:** You agree to pay the monthly rent at the Landlord's address on or before the 1st day of each month. Time is of the essence. Rent payments must be made by one check or money order even if there is more than one resident. Payments should not be made in cash. If the rent is paid after the **4th** of the month, a late charge of $ _100_ will be due, plus an additional charge of $ _0_ per day for each day thereafter until the rent is paid in full, all as additional rent. However, we reserve the right to refuse payment after expiration of our demand for rent of possession as provided for in Alabama Statutes. All late payments must be made by cashier's check or money order. If your check is dishonored by your bank, you must pay us a service charge of $ _75_ plus any other charges and penalties provided by Alabama Law plus any accrued late charge. If two of your checks are dishonored, you must pay future rent by cashier's check or money order. We are not required to redeposit dishonored check. You must pay to us any sales or other taxes which are due on your rental payments. Any monies that you owe to us are deemed rent under this lease. Payments, at our option, may first be applied to any outstanding balance.

**I.** **RENEWAL TERM:** Either party may terminate this agreement at the end of the initial term by giving the other party sixty (60) days written notice prior to the end of the term, but if no notice is given, then the agreement will be extended on a month-to-month basis at market rent plus an additional $100.00 per month-to-month charge. Termination must be the last day of the initial term of the last day of a subsequent calendar month. Rent may be increased after the initial term upon not less than 60 days notice.

**J.** **DEFAULT AND REMEDIES:** If you default in complying with this lease or the law, we have the right to retake possession as provided by Alabama law. Rent is accelerated upon default. Under no circumstances can our acceptance of your keys, or re-entry or any other action be considered as a termination of the lease or retaking for our own account. If you vacate before expiration of your lease term, you must still pay rent for the entire term of the lease or until we re-rent your dwelling, plus you must pay $30.00 for each remaining month or fraction as a liquidated damage for our re-rental expenses. If you or your invitee engages in criminal activity on the premises, such action will be a default for which your lease may be immediately terminated. In addition to any of the foregoing, we and we have any other rights and remedies provided by law.

**K.** **HOLD OVER:** Resident shall deliver possession of apartment in good order and repair to Management upon termination of this agreement. If you fail to deliver all keys and cards on or before your lease termination, you must pay double rent until you do so.

**L.** **NOTICES:** Any notices from us to you will be deemed delivered when mailed to you at your apartment by first class mail; or personally handed to you or anyone in your apartment; or left at your apartment in your absence. Delivery of one copy of a notice is sufficient for all residents. Any notice from you to us will be deemed delivered when received at our office, certified mail, return receipt requested, or personally delivered to our office staff during normal business hours.

**M.** **RIGHT OF ACCESS:** You consent to our entering your apartment during reasonable hours for any inspections, maintenance and repairs, and pest control procedures which we deem necessary in our sole discretion; and for delivering notices and for other purposes as provided by the law. In case of emergency, we may enter at any time to protect life and prevent damage to the property. In the event we propose showing your apartment to a future prospective tenant, Management shall provide you with at least two (2) days prior notice.

**N.** **REPAIRS:** You acknowledge that you have inspected the apartment and are fully satisfied and accept it in its "as is" condition, except as otherwise agreed by you and us in writing. You are responsible for the removal of trash and garbage from your apartment to the appropriate collection point and for maintaining your apartment, equipment, and fixtures in a clean, sightly, and sanitary condition. We will maintain air conditioning and heating equipment; plumbing fixtures and facilities; electrical systems; and appliances provided by us. We will make necessary repairs to apartments with reasonable promptness after receipt of written notice from you. Any damage to your apartment or the premises, except for normal wear, caused by you or your invitees will be corrected, repaired or replaced at your expense. Resident may not remodel or structurally change apartment, nor remove any fixture there from. **You must notify us in writing of any needed maintenance or repair. You must inspect your smoke detector at least once a month to determine if it is working properly and notify us of any deficiency. You must change the air conditioning and heating filter monthly, or more often if required.**

**O.** **ALTERATIONS:** You may not make alterations or additions, nor install or maintain in the apartment, or any part of the premises, any fixtures, large appliances, devices, or signs without our written consent. Any alterations, additions, or fixtures that are made or installed will remain a part of the apartment, unless we specifically agree otherwise.

**P.** **PROPERTY LOSS:** We will not be liable for any damage, loss, or injury to persons or property occurring within our apartment or upon the premises, whether caused by us or someone else. You are responsible for obtaining your own fire, flood, casualty, extended coverage and liability insurance. **WE STRONGLY RECOMMEND THAT YOU SECURE INSURANCE TO PROTECT YOURSELF AND YOUR PROPERTY.** Your successors, heirs, beneficiaries, and personal representatives are bound by the provisions of this lease.

**Q.** **SECURITY:** We do not provide and have no duty to provide security services for our protection or the protection of your property. You must look solely to the public police for such protection. We will not be liable for failure to provide security services to protect you, your family, or others, or your property from the criminal or wrongful acts of our employees, agents, or others. If, from time to time, we provide any security services, those services are only for the protection of our property and will not constitute a waiver of, or in any manner modify this disclaimer.

**R.** **FIRE AND CASUALTY:** If your apartment becomes inhabitable because of fire or other casualty or unforeseen event, then you may immediately vacate the apartment and notify landlord in writing within fourteen (14) days thereafter of your intention to terminate the rental agreement due to said fire or other casualty, upon which this Agreement shall terminate as of the date that you vacated the apartment. Otherwise, in the event you choose not to vacate and terminate this Agreement, then we may, at our option, terminate this lease or repair the apartment within thirty (30) days. If we elect not to repair the apartment, this lease will immediately terminate. If we do elect to repair the apartment, and if the damage is not due to you, your family, or invitee's negligence, the rent will abate during the time you cannot occupy the apartment. Nothing may be used or kept in or about your apartment which would in any way affect the terms and conditions of our fire and extended coverage insurance policy, be a violation of law, or otherwise be a hazard.

**S.** **CUMULATIVE RIGHTS AND WAIVERS:** Our rights and remedies under this lease are cumulative; the use of one or more shall not exclude or waive our right to other remedies. Your rights under this lease are subordinated to any present or future mortgages on the premises. We may assign our interest in this lease. You waive your right to demand a jury trial concerning the litigation of any matters arising between us.

**T.** **FAILURE OF MANAGEMENT TO ACT:** Failure of Management to insist upon strict compliance with the terms of this agreement shall not constitute a waiver of Management's right to act on any violation.

**U.** **ABANDONMENT:** Abandoned property: By signing this rental agreement, the tenant agrees that upon surrender or abandonment, as defined by the Alabama Statues, the landlord shall not be liable or responsible for storage or disposition of the tenant's personal property.

**V.** **DEFAULT BY RESIDENT:** Any breach or violation of any provision of the agreement by Resident or any untrue or misleading information in Resident's rental application shall give Management the right to terminate this agreement or to take possession and hold Resident liable for the remainder of the term.

**W.** **POSSESSION:** If the apartment is not ready for your occupancy on the beginning date of this lease to causes beyond our control, you may choose to abate the rent until occupancy is granted, or you may otherwise terminate this Agreement upon written notice to us within five (5) days of the original beginning date of this lease, upon which we shall return all security deposits and advance payments of rent paid by you. In no event shall we be liable for any of your expenses caused by such delay or termination.

EXHIBIT 1

**X.   RULES AND REGULATIONS:**

    (a)  No signs, exterior lights, markings, or other objects which we deem to be unsightly may be displayed in your windows or elsewhere on the premises. No awnings or other projections shall be attached or extended to the outside of any apartment or building except by us.

    (b)  Locks may not be altered nor may new locks, knockers, or other door or window attachments be installed without our prior written consent.

    (c)  Entrances, hallways, lawns and other public areas shall not be obstructed or used for any purpose other that ingress and egress.

    (d)  Radio or television aerials shall not be placed or erected on the roof or exterior of buildings.

    (e)  Resident agrees to abide by the parking regulations established by Management. Except for automobiles and non-commercial small trucks, no vehicles (including motorcycles, trucks, boats or boat trailers, campers, travel trailers, and motor homes) may be parked on the premises without our prior written consent. All vehicles must be currently licensed and in good operating condition and must be parked only within spaces provided for parking. No vehicle may be parked in front of dumpsters, blocking other vehicles, on the grass, outside the boundaries of a single designated parking space, or in entrances or exits. Any violations of the foregoing rules will subject the vehicle to being towed without notice at the owner's expense. We are not liable for any damages arising as a result of towing. You acknowledge that it is your responsibility to advise your invitees of these vehicle policies, and you further agree to determine in each case that they have complied therewith. You agree to indemnify and hold us harmless for any claims by your invitees for the towing of their vehicles for violation of these policies; you agree to pay for said towing and other charges related thereto as additional rent to be paid immediately. We may impose additional parking regulations including limiting the number of vehicles which you or your invitees may park on the premises, requiring the use of parking decals on vehicles, and/or assigning parking spaces. No more than one vehicle is allowed for each adult resident without our written consent. No vehicle maintenance or repairs or similar activities may be performed on the premises. Non-operative vehicles are not permitted on premises. Any such non-operative vehicle may be removed by us at the expense of Resident owning same, for storage or public or private sale, at our option, and Resident owning same shall have no right of recourse against us therefore. Signs may not be displayed on or from vehicles.

    (f)  No goods or materials of any kind or description which are combustible or would increase fire risk shall be taken or placed in storage areas. Storage in such areas shall be at Resident's risk and Management shall not be responsible for any loss or damage.

    (g)  No nails, screws or adhesive hangers, or the like may be driven or applied to the walls, or other surfaces, except standard picture hooks, shade brackets and curtain rod brackets may be placed in walls, woodwork or any part of apartment without our prior written consent. You are responsible for the cost of repairing any holes.

    (h)  Balconies, patios, hallways, and entrances may not be used to store belongings. Only appropriate potted plants and outdoor furniture are permitted on patios and balconies. We may further limit what is placed in outside areas. Additionally, all outside areas shall be kept neat and clean at all times. No rugs, towels, laundry, clothing or other items shall be stored, hung or draped on railing or other portions of balcony or patio.

    (i)  Resident agrees to abide by rules and regulations established for use of recreational and service facilities provided by the management.

    (j)  Residents shall be responsible and liable for the conduct of his guests. Acts of guests in violation of this agreement or Management's rules and regulations may be deemed by Management to be a breach by Resident.

    (k)  All drapes and shades installed by the Resident must be lined in white to present a uniform exterior appearance.

    (l)  No water-filled furniture is permitted except water beds. Waterbeds are not permitted unless we are first protected as a loss payee on an insurance policy approved by us for the full value of the apartment and contents. The policy must first be approved by us before you can fill a water-filled bed in the apartment.

    (m)  No noise, music, or other sounds, or conduct or attire (or lack of) is permitted at any time in such manner as to disturb or annoy other persons. Certain attire may be prohibited such as "T-back" swim suits.

    (n)  Solicitation by you or others is not allowed on the premises.

    (o)  No "garage" or other sales may be conducted by you on the premises.

    (p)  No exotic pets allowed.

**Y.   ENTIRE AGREEMENT:**   This agreement and any attached addendum's constitute the entire agreement between the parties and no oral statements are binding.

**Z.   FAILURE TO COMPLY:**   In the event you terminate this lease early, you must give a 60 day written notice, plus pay a termination fee equal to **ONE** month's rent. With the satisfaction of payment of the above references termination fee and the fulfillment of the remaining provisions of this lease your Security Deposit may be refunded. Should you fail to comply with the above you will be subject to owing all remaining rent throughout the term of this lease.

EXHIBIT 1

ELECTRONICALLY FILED
3/3/2017 4:00 PM
01-CV-2017-900817.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

September 22, 2015


Blue Rock Partners, LLC
9260 Bay Plaza Boulevard, Suite 501
Tampa, Florida 33619
Attention: Reuven Oded

Re:  Management Agreement dated June 17, 2013 between Westbury at Lake Brandon
Investments, LLC ("Westbury") and Blue Rock Partners, LLC ("Blue Rock" or "you");
Management Agreement dated October 31, 2013 between Autumn Birmingham LLC
("Autumn") and Blue Rock; Management Agreement dated October 31, 2013 between
Ashford Townhomes Birmingham LLC ("Ashford") and Blue Rock; Management
Agreement dated October 31, 2013 between Stone Birmingham LLC ("Stone") and
Blue Rock; Management Agreement dated October 31, 2013 between Oak
Birmingham LLC ("Oak") and Blue Rock; Management Agreement dated November
15, 2013 between Boulder Birmingham LLC ("Boulder") and Blue Rock; Management
Agreement dated December 31, 2014 between Knightsbridge Investments, LLC
("Knightsbridge") and Blue Rock; Management Agreement dated February 25, 2015
between Cameron Lakes, LLC ("Cameron") and Blue Rock; Management Agreement
dated March 17, 2015 between Coachman Crossing LLC ("Coachman") and Blue
Rock; Management Agreement dated May 28, 2015 between Magnolia Birmingham
LLC ("Magnolia") and Blue Rock; and Management Agreement dated August 27, 2015
between Deerfield Birmingham LLC ("Deerfield", and with Westbury, Autumn,
Ashford, Stone, Oak, Boulder, Knightsbridge, Cameron, Coachman, and Magnolia, the
"Owners") and Blue Rock (collectively, the "Management Agreements" and
individually, each a "Management Agreement")

Dear Reuven:

The Owners hereby give notice in accordance with Section 2 of each Management Agreement
that the Owners believe cause (as defined in each Management Agreement) to terminate each
Management Agreement exists. The specific issues are outlined on Exhibit A. Generally, the audit
performed on behalf of the Owners and the Manager found significant oddities and the Owners have
determined that you have insufficient controls on operations and cash. In addition, you have provided
inaccurate and incomplete monthly financials, grossly exceeded established budgets, altered budgets
without approval, passed through to the Owners expenses that were not payable by the Owners
pursuant to the Management Agreements and failed to reimburse the Owners for such expenses when
requested, failed to pay bills and amount owing under contracts, resulting in the termination of certain
material contracts, had checks issued with insufficient funds, failed to properly screen and test
employees, and failed to notify the Owners of certain changes in personnel as required by the
Management Agreements. The Owners have previously notified you of many of these issues and you
have failed to correct them, even after, in certain instances, acknowledging the issues. The Owners
once again request that you correct such issues and will continue to assess their respective rights under
each Management Agreement.

EXHIBIT 2

Sincerely,

GK Birmingham LLC, the sole member of each of
Autumn Birmingham LLC, Ashford Townhomes
Birmingham LLC, Stone Birmingham LLC, Oak
Birmingham LLC, Boulder Birmingham LLC,
Magnolia Birmingham LLC, and Deerfield
Birmingham LLC

By: _____

Name: Conrad Suszynski
Title: Authorized Signatory

Westbury at Lake Brandon Investments, LLC

By: _____

Name: Conrad Suszynski
Title: Authorized Signatory

Knightsbridge Investments, LLC

By: _____

Name: Conrad Suszynski
Title: Authorized Signatory

Cameron Lakes, LLC

By: _____

Name: Conrad Suszynski
Title: Authorized Signatory

Coachman Crossing LLC

By: _____

Name: Conrad Suszynski
Title: Authorized Signatory

EXHIBIT 2

## Exhibit A

1. Manager has failed to properly deal with and account for trust funds. Checks written by Manager were issued with insufficient funds. Monthly financials are inaccurate and incomplete.
2. Manager has failed to complete background checks and illegal drug screens on its employees.
3. In 2014, substantial corporate level expenses were charged to the properties including regional bonuses, regional travel, management travel, third party accounting expenses, and regional manager salaries. Additionally, the rehab coordinator has been receiving free rent at Buckingham, even though he is a regional employee.
4. Currently, Manager is well over 10% over budget on multiple items. Manager did not request approval prior to going over budget on these items. Some of the larger items listed below:

| Property | Item | % Over Budget | $ Over Budget | Property | Item | % Over Budget | $ Over Budget |
|---|---|---|---|---|---|---|---|
| Buckingham | Cabinets/Counters | 68% | $ 135,021 | Wakefield | Refrigerators | 107% | $ 16,063 |
| Buckingham | Carpet | 17% | $ 25,356 | Wakefield | Wood Plank | 64% | $ 32,019 |
| Buckingham | HVAC | 55% | $ 13,828 | Wakefield | Misc. Interior Rehab | 205% | $ 71,813 |
| Buckingham | Misc. Interior Rehab | 115% | $ 97,792 | Wakefield | Rehab Emp. Labor | 107% | $ 32,186 |
| Buckingham | Rehab Emp. Labor | 41% | $ 30,778 | Wakefield | Tub Repairs | 166% | $ 16,613 |
| Buckingham | Tub Repairs | 102% | $ 20,493 | Wakefield | Roof Replacement/Repairs | 94% | $ 56,295 |
| Buckingham | Parking/Curbs | 86% | $ 77,244 | Wakefield | Signage | 70% | $ 10,466 |
| Buckingham | Clubhouse Furniture | 17% | $ 11,922 | Wakefield | Clubhouse Remodel | 74% | $ 11,104 |
| Carlyle | Cabinets/Counters | 151% | $ 102,430 | Wellington | Misc. Interior Rehab | 180% | $ 62,944 |
| Carlyle | Electrical | 87% | $ 43,403 | Wellington | Rehab Emp. Labor | 41% | $ 14,441 |
| Carlyle | HVAC | 229% | $ 62,269 | Wellington | Tub Repairs | 71% | $ 7,100 |
| Carlyle | Misc. Interior Rehab | 193% | $ 144,443 | Wellington | Laundry Room Repairs | 236% | $ 11,800 |
| Carlyle | Rehab Emp. Labor | 140% | $ 105,030 | Wellington | Parking/Curbs | 40% | $ 19,889 |
| Carlyle | Parking Curbs | 65% | $ 48,545 | | | | |
| Callington | Cabinets/Counters | 24% | $ 69,235 | | | | |
| Callington | Electrical | 61% | $ 24,589 | | | | |
| Callington | HVAC | 171% | $ 42,825 | | | | |
| Callington | Misc. Interior Rehab | 347% | $ 173,321 | | | | |
| Callington | Rehab Emp. Labor | 179% | $ 89,616 | | | | |

In addition, Manager has made changes to the budgets without notification or consent of Owner.

5. Manager has failed to pay invoices and had service cancelled multiple apartment marketing websites.
6. Budgets were required to be delivered by October 1, 2014 and Manager delivered five on 11/18 and Westbury on 11/21
7. Financials are to be provided by the 15th of the month. They have been provided late on every occasion on all 11 properties, for example, recent occasions are listed below:

EXHIBIT 2

|            | Delivery  |
|------------|-----------|
| Financials | Date      |
| YE 2014    | 1/23/2015 |
| Jan 2015   | 3/7/2015  |
| Feb 2015   | 3/20/2015 |
| Mar 2015   | 4/24/2015 |
| Apr 2015   | 5/20/2015 |
| May 2015   | 6/20/2015 |
| June 2015  | 7/18/2015 |

8. Manager has not reviewed tenant ability to pay rent and rental history with references from prior landlords.

9. Proper controls on cash at the properties were not in place which has resulted in significant employee theft and fraudulent activity.

10. Manager is required to handle all complaints and requests from 3rd parties including tenants at each property and record each in a systematic fashion in order to show the action taken. All the pools at the five Birmingham properties were closed the majority of the summer due to non-compliance.

11. Manager is required to notify Owner of any pending changes in Manager's personnel for a property at least five days prior to such changes if the person is a regional manager, property manager or head of maintenance. Owner has not been notified of most changes in personnel at the Property Manager or Head of Maintenance level, although 10 or more different hires/changes in roles have occurred.

EXHIBIT 2

ELECTRONICALLY FILED
3/1/2017 4:00 PM
01-CV-2017-900817.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

Rock Partners, LLC
"Excellence in Real Estate Management"

September 30, 2015

Rob Mackenzie
Goff Capital Partners
6465 S. Greenwood Plaza Blvd. #1075
Centennial, CO 80111

Re: Resignation of Blue Rock Partners LLC as Management Company in Birmingham,
Alabama for the following properties:

1. The Park at Deerfield
2. The Park at Hoover
3. The Park at Wakefield
4. The Park at Wellington
5. The Park at Buckingham
6. The Park at Callington
7. The Park at Carlyle

Dear Rob:

Please accept this letter as our formal Resignation Notice for each of the above listed properties
pursuant to the current Management Agreements relating thereto.

The foregoing resignation for each applicable Management Agreement shall be effective on the
later date of either November 1, 2015 or upon receipt of written approval from the appropriate
Lender authorizing the change of the Property Manager, and if applicable, a release of the
corresponding personal Guaranty provided by Reuven Oded, for each of the respective
properties.

Please also note that the foregoing resignation shall be subject to and contingent upon a mutual
release to be executed between the parties as of the final date that we are to serve as the
Property Manager for each property.

It has been a pleasure serving you and we wish you all the success.

Respectfully,

Reuven Oded
Managing Partner

5630 Breckenridge Park Dr. Suite 302  •  Tampa, FL 33610  •  Phone 813.620.0800  •  Fax 813.620.3777  •  www.bluerockpartnersllc.com

EXHIBIT 3